EDWARD T. and ISABEL J. LYSEK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lysek v. Commissioner
Docket No. 5368-68.
United States Tax Court
T.C. Memo 1975-293; 1975 Tax Ct. Memo LEXIS 81; 34 T.C.M. (CCH) 1267; T.C.M. (RIA) 750293; September 22, 1975, Filed Edward T. Lysek, pro se. Vernon R. Balmes, for the respondent. HOYT
MEMORANDUM FINDINGS OF FACT AND OPINION HOYT, Judge: The respondent determined deficiencies in income tax and additions thereto for the petitioners as follows: Additions To The Tax
Year
Income Tax Deficiency
Section 6653(a) [1]
1964
$ 1,057.25
$ 52.86
1965
6,708.21
335.41
1966
14,618.00
730.90
Several concessions having been made, [2] the issues remaining for our consideration are: (1) Whether respondent's determination is presumptively correct. *84 (2) Whether petitioner had unreported income of $ 1,190.66 in 1964 and $ 2,141.19 in 1966. [3]
(3) Whether petitioner is entitled to business expense deductions in excess of the amounts allowed by respondent for each of the years 1964 to 1966, inclusive. (4) Whether respondent correctly disallowed deductions for depreciation for the years 1964 to 1966 to the extent of $ 4,290.49, $ 3,822.02 and $ 5,930.01, respectively. (5) The computation of the allowable investment credit for 1966. (6) The fair market value of standing timber on January 1, 1966, cut and sold by petitioner during 1966, for section 631(a) purposes. (7) Whether any part of the underpayment for each of the years 1964 to 1966 was due to "negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and exhibits referred to therein are incorporated herein by this reference. Petitioners, Edward T. Lysek and *85 Isabel J. Lysek [4] are husband and wife, who resided in Fort Bragg, California, during their taxable years 1964 through 1966, inclusive, and at the time the petition herein was filed. Their joint returns for the years in question were timely filed with the district director of internal revenue at San Francisco. Petitioner is a medical doctor and surgeon, an alumnus of Stanford and The University of California. He practiced in a building, owned by petitioners at 523 South Main Street, Fort Bragg, during the years in issue. The property was acquired in 1964 at a cost of $ 14,500. In 1964, Dr. Lysek spent $ 13,414.77 to convert the residence which was on the property when it was purchased into medical offices. In the process of renovation most of the original structure was destroyed. Petitioners resided with their daughter, Jean, born December 20, 1953, and their two sons, Edward, born March 20, 1957, and John, born February 5, 1959, on their Tara property located approximately seven miles from petitioner's office *86 in Fort Bragg. The Tara property consisted of approximately 124 acres of land on which a dwelling house, a barn, outbuildings and standing timber were located. It was acquired in 1961 at a cost of $ 48,500. In the Mendocino County real estate tax bills for the property for the fiscal year ended June 30, 1962, the assessed valuation was allocated as follows: 21.7 percent to land, 54.1 percent to improvements, and 24.2 percent to personal property. Petitioners' residence on the Tara property consisted of approximately seven rooms and one and one-half baths, containing, in all, 1,600 to 2,000 square feet. One bedroom was occupied by petitioners and the other two by petitioners' children. In 1964, petitioners insured this home for $ 15,000. Petitioner examined a few dozen patients at his home during 1964 for no longer than 15 minutes each and stored medical supplies in a washroom there. Records of the medical practice were kept at his office in Fort Bragg. The Tara property was also used by petitioner during 1965 and 1966 for raising cattle and during 1966 for timber logging operations. Petitioner's Tara property adjoined the Jackson State Forest. In November, 1965, a sale of timber *87 (known as "Hare Creek Sale Number 1") took place in the State Forest from a tract contiguous to the northern boundary of petitioner's property. This sale consisted of 58 percent old-growth, large-diameter timber, and the selling price was $ 30 per thousand board feet. Petitioner's property had been logged at the turn of the century and in the late 1950's by the prior owners before it was acquired by petitioner. Petitioner's property on January 1, 1966, contained small-diameter redwood and Douglas fir trees which had not been logged as yet and were not attractive to logging companies due to their small size. In 1966, petitioner hired choppers who cut approximately 660,000 board feet of predominantly second-growth small diameter timber on the property, of which 49 percent was redwood, 49 percent Douglas fir and 2 percent hemlock and other woods. Of this timber, 491,620 board feet was trucked to a sawmill which paid petitioner $ 24,255.51. The remaining chopped timber, approximately 168,390 board feet, consisted of defective timber left in the field, breakage, trim and waste. Timber companies attribute no value to such elements, paying only for net merchantable logs delivered to the *88 mill. Sales of timber were made which were comparable to the timber cut and sold in 1966 by petitioner on the dates and for the prices as follows: Price *
Description
Sale Date
Redwood
Douglas Fir
Berry Gulch #2
1/19/65
$ 8.00
$ 15.00
Mitchell Creek #1
3/18/65
18.00
18.00
Masonite
6/27/66
15.00
20.00
Walthem to Aborigine
1965
11.00
19.00
Walthem to Aborigine
1965
12.00
20.00
During the period in question petitioner was involved in two timber trespass awards. A "timber tespass" occurs when one party cuts timber on another party's property without permission. Often this occurs through inadvertence when an owner engaging in logging his own property mistakenly cuts trees across the boundry line of an adjoining property. In such instances the trespasser is legally obligated to compensate the property owner for the trees cut. Such compensation, when determined by a court, is referred to as a timber trespass award. Timber trespass awards determined by courts are generally higher than amounts which would be paid property owners by logging contractors since the court does *89 not consider logging costs and because such court awards are punitive in nature and include the trespasser's profit as well as the value of the standing timber. In the two timber trespass cases in which petitioner was involved (one as trespassor and the other as the owner whose property was trespassed upon) the trespass awards were made on the basis of $ 30 per thousand board feet. Internal Revenue Agent William Roach (Roach) was assigned to audit petitioner's 1964 Federal income tax return. When petitioner refused to furnish the records requested by Roach in October, 1965, a summons was served on January 19, 1966. When petitioner refused to comply with this summons, he was ordered by the United States District Court, on two separate occasions, to comply. The court also held petitioner's tax consultant, Ted Watkins, in civil contempt for refusing to turn over the requested records to petitioner so he could comply with the summons. Petitioner finally complied with the court's order on August 1, 1967. When Roach requested petitioner's records for 1965 and 1966, which years had subsequently been assigned to him for audit, petitioner refused to provide them. Roach issued a summons *90 on August 2, 1967, with which petitioner refused to comply, and the District Court subsequently entered an order finding petitioner in contempt. The summons enforcement proceedings were terminated by the United States after petitioner refused to comply based upon his Fifth Amendment rights. In his statutory notice to petitioners, dated August 15, 1968, relating to their taxable years 1964 to 1966, inclusive, respondent determined that petitioners' returns did not reflect their correct income because income was understated for 1964 and 1966 and deductions overstated for all years at issue; that business expenses claimed had not been verified or shown to be "ordinary and necessary", "reasonable" or "required"; that depreciation claimed for buildings and improvements was excessive; and that depreciation claimed for cattle in 1964 was unsubstantiated and should be disallowed. The following table sets forth the various categories and amounts of business expense deductions claimed by petitioner in his returns; the amounts allowed by respondent in the notice of deficiency; and the amounts which we have determined to be allowable (as found and discussed hereinafter), for each of the years *91 1964, 1965 and 1966: 1964
Amounts
Amounts
Amounts
Allowed in
Allowed by
Claimed
Stat. Not.
Court
Depreciation
$ 10,078.67
$ 5,788.18
$ 6,005.50
Labor
3,763.24
9,297.22 [2]
9,297.22
Merchandise
4,924.02
4,994.20 [2]
4,994.20
Supplies & Other
3,254.50
5,048.14
5,048.14
Feed & Supplies [5]
Taxes
3,341.82
2,921.76 [2]
2,921.76
Insurance
1,204.50
1,214.50 [2]
1,214.50
Legal & Professional
1,484.04
381.00 [2]
381.00
Interest
2,059.39
1,690.47
2,059.39
Dues
81.48
39.55 [2]
39.55
Promotion
94.04
51.76
51.76
Entertainment & Promotion
Travel & Promotion
Auto & Travel [6]
957.52
1,024.19 [2]
1,024.19
Utilities
1,321.05
1,141.67 [2]
1,141.67
Office & Misc.
104.13 [1]
104.13
Repairs & Maintenance
Refunds
Machine Hire
Trespass
Stumpage
1965
Amounts
Amounts
Amounts
Allowed in
Allowed by
Claimed
Stat. Not.
Court
Depreciation
$ 9,689.42
$ 5,867.40
$ 6,252.72
Labor
19,778.34
10,226.94
19,778.34 [3]
Merchandise
8,327.26 [4]
6,727.26
6,727.26
Supplies & Other
Feed & Supplies [5]
Taxes
6,315.98
3,213.94
5,639.68
Insurance
2,762.41
1,335.95
2,171.35
Legal & Professional
580.00
419.10
580.00
Interest
2,796.67
1,859.52
2,253.68
Dues
257.96
43.51
43.51
Promotion
Entertainment & Promotion
260.00
56.94
68.56
Travel & Promotion
Auto & Travel [6]
1,408.53
1,408.53
1,408.53
Utilities
1,977.96
1,255.84
1,811.66
Office & Misc.
1,319.30
114.54
1,319.30
Repairs & Maintenance
Refunds
Machine Hire
Trespass
Stumpage
*92 1966
Amounts
Amounts
Amounts
Allowed in
Allowed by
Claimed
Stat. Not.
Court
Depreciation
$ 10,967.73
$ 5,037.72
$ 5,305.04
Labor
19,235.89
11,156.66
19,191.99
Merchandise
Supplies & Other
Feed & Supplies [5]
8,355.08
8,055.08
8,055.08
Taxes
4,708.98
3,506.11
4,708.98
Insurance
1,563.30
1,457.40
1,457.40
Legal & Professional
929.02
457.20
929.02
Interest
3,831.50
2,028.56
2,217.63
Dues
Promotion
Entertainment & Promotion
Travel & Promotion
1,040.00
62.11
264.48
Auto & Travel [6]
1,637.58
1,229.03
1,474.89
Utilities
2,099.23
1,370.00
1,935.65
Office & Misc.
2,124.74
124.96
1,858.44
Repairs & Maintenance
2,269.29
1,815.43
1,815.43
Refunds
98.00
78.40
92.00
Machine Hire
4,714.18
3,771.34
4,714.18
Trespass
124.27
99.42
99.42
Stumpage
20,325.00
8,357.00
8,357.00
*93 The following table sets forth the various assets with respect to which depreciation deductions were claimed by petitioner, the basis and depreciation rates (using the declining balance method) as claimed by petitioner and as allowed by respondent, for each of the years in question: 1964
Basis
Rate
Claimed
Allowed
Claimed
Allowed
Office bldg.
$ 17,642.93
$ 17,474.77 [1]
5%
5%
Office fixtures & eqpt.
12,999.71
17,797.20
10%
10%
Truck & auto
13,923.76
13,923.76
20%
20%
Ranch bldgs.
44,300.00
11,022.50 [2]
8%
8%
Ranch eqpt.
5,718.10
5,718.10
20%
20%
Rental unit
0
3,199.50
8%
Cattle
1965
Basis
Rate
Claimed
Allowed
Claimed
Allowed
Office bldg.
$ 18,970.89
$ 17,474.77 [1]
10%
5%
Office fixtures & eqpt.
13,725.63
17,797.20
20%
10%
Truck & auto
17,160.98
17,160.98
20%
20%
Ranch bldgs.
44,300.00
11,022.50 [2]
8%
8%
Ranch eqpt.
6,799.91
6,799.91
20%
20
Rental unit
0
3,199.50
8%
Cattle
839.00
0
20%
1966
Basis
Rate
Claimed
Allowed
Claimed
Allowed
Office bldg.
$ 22,470.87
$ 17,474.77 [1]
10%
5%
Office fixtures & eqpt.
13,725.63
17,797.20
20%
10%
Truck & auto
17,160.92
17,160.98
20%
20%
Ranch bldgs.
44,300.00
11,022.50 [2]
10%
8%
Ranch eqpt.
17,199.91
6,799.91
20%
20%
Rental unit
0
3,199.51
8%
Cattle
0
0
*94 Respondent further determined that at least part of the underpayment of tax for each year was due to negligence or intentional disregard of rules and regulations, resulting in the five percent addition to the tax provided by section 6653(a). ULTIMATE FINDINGS OF FACT (1) Petitioner had unreported income of $ 1,190.66 in 1964 and $ 2,141.19 in 1966. (2) Petitioner incurred deductible business expenses in the amounts set forth in the table on page 10 hereinabove, in the columns headed "Amounts Allowed by Court" for each of the years 1964 through 1966. (3) The fair market value of standing timber on petitioner's property, which was cut and sold during 1966, was $ 8,357 as of January 1, 1966. (4) Part of petitioner's underpayment of tax for each of the years 1964 through 1966 was due to negligence or intentional disregard of rules and regulations. OPINION 1. Burden of Proof
It is clear that *95 respondent's determination of deficiencies as set forth in the notice of deficiency for each of the years before us is presumed to be correct and that petitioners have the burden of establishing error therein. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
Petitioner has consistently claimed that since the deficiencies asserted were excessive and without rational foundation, the burden of proof shifted to the respondent. He cites Helvering v. Taylor,293 U.S. 507 (1935) to support his claim that he need prove only that the Commissioner's determination is arbitrary in order to have it set aside, and that he has no obligation to prove the correct amount of the tax owing. However, petitioner has failed to demonstrate that respondent's determination was excessive or arbitrary; we have found no support in the record for petitioner's contention. Rather, to the contrary, the record reveals a continuous resistence by petitioner and his tax adviser to respondent's attempts to examine petitioner's books and records. Records for 1964, which were requested by respondent's agent in October 1965, were not made *96 available until August 1967, pursuant to a court order. Although a deficiency was determined for 1964, the statutory notice of deficiency sets forth detailed and reasonable explanations of all adjustments, none of which appears arbitrary on its face; moreover, respondent even allowed additional deductions (in six different expense categories) totaling more than $ 7,500 beyond what petitioner had claimed in his 1964 return. Respondent's determinations of deficiencies for 1965 and 1966 were made without access to petitioner's books and records for those years, since petitioner had refused to make such records available (despite a court order), based upon his Fifth Amendment rights. Petitioner contends that adjustments made with respect to his 1965 and 1966 returns must have been arbitrary and without foundation since they were made without examination of his books and records for those years. Such a contention brings to mind the anecdote about the child being tried for killing his parents, who then requested mercy on the grounds that he was an orphan. If the adjustments determined by respondent were inaccurate due to the unavailability of petitioner's records, such inaccuracy was caused *97 by petitioner's own course of action. Estate of Mary Mason,64 T.C. 651 (July 28, 1975); Arthur Figueiredo,54 T.C. 1508 (1970), affirmed summarily F. 2d (9th Cir. 1973). Any injustice which may have resulted to petitioner from respondent's adjustments was within petitioner's own power to correct by making his records available. In fact, respondent even conceded certain adjustments for 1966 in favor of petitioner, when some of petitioner's records were finally made available at the time of trial. Respondent must be given great latitude in determining petitioner's liability, particularly when the taxpayer refuses to cooperate in such determination. Joseph F. Giddio,54 T.C. 1530 (1970). It is clear that petitioner cannot, by the exercise of his Fifth Amendment rights, shift the burden of proof on the grounds that respondent's determination is arbitrary and invalid. Arthur Figueiredo,supra.Further, petitioner cannot rely on the belated production of his records at trial to shift the burden of proof to respondent. *98 Mark Durovic,54 T.C. 1364, 1393, affd. in part, revd. in part and remanded in part, without discussion of this issue, 487 F. 2d 36 (7th Cir. 1973), cert. denied 417 U.S. 919 (1974). Therefore, since we find that petitioner failed to establish at trial that the deficiencies as determined were arbitrary or excessive, the burden of proof remained on him. Estate of Mary Mason,supra.
We further hold that except as specifically noted later herein, petitioner failed to meet his burden of proving the amounts of the deductions which he claimed. In addition to the hundreds of canceled checks admitted into evidence, his evidence consisted primarily of his reciting information contained in his returns for the years in question, previously admitted into evidence, and his uncorroborated testimony. It is clear that mere denials of liability for the tax are not sufficient to sustain the burden of proof required. While sworn testimony alone may suffice as proof *99 at times, where, as here, it is general and conclusory in nature and subject to doubt, it fails to meet petitioner's burden of proof. Reginald G. Hearn,36 T.C. 672, 673-4 (1961), affd. 309 F. 2d 431 (9th Cir. 1962), cert. denied 373 U.S. 909 (1963). To allow such testimony to meet the burden of proof would negate the presumption of the Commissioner's determination where the taxpayer swears to the correctness of his return. Louis Halle,7 T.C. 245 (1946), affd. 175 F. 2d 500 (2d Cir. 1949), cert. denied 338 U.S. 949 (1950). Further, despite petitioner's argument to the contrary, his tax return, though signed under penalty of perjury, carries no presumption of correctness of the amounts stated therein, and is to be regarded as nothing more than his original self-serving statement regarding his tax liability. 2. Unreported Income
Respondent determined that petitioners had unreported income of $ 1,190.66 in 1964 and $ 6,242.83 in 1966, but in his opening statement respondent reduced the unreported *100 income for 1966 to $ 2,141.19. Here again, the determination of the respondent is prima facie correct. Petitioner failed to meet his burden of proof as to this issue by merely denying his liability, without providing any information which would furnish a basis for believing such testimony. Louis Halle,supra.Petitioner claims that he has not been told the basis for respondent's determinations of unreported income for 1964 and 1966, and therefore, he cannot be held responsible for proving a negative (i.e., that he did not receive more income than he reported). However, the record clearly reveals that the unreported income for 1966 was determined by respondent, using the bank deposit method (which has long been a permissible method of indirectly determining income, Gleckman v. United States,80 F. 2d 394, 399 (8th Cir. 1935), cert. denied 297 U.S. 709 (1936); Estate of Mary Mason,supra). Thus, the basis of the determination for 1966 was known to petitioner, and he was in a position to meet his burden of proof by presenting "evidence identifying and explaining the nature of the bank deposits in question." Hoefle v. Commissioner,114 F. 2d 713, 714 (6th Cir. 1940), *101 affg. a Memorandum Opinion of this Court. It is well established that failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Estate of J. Leslie Vogel,30 T.C. 125, 134 (1958), affd. 278 F. 2d 548 (9th Cir. 1960); O'Dwyer v. Commissioner,266 F. 2d 575, 584 (4th Cir. 1959), cert. denied 361 U.S. 862 (1959). The basis for respondent's determination of unreported income of $ 1,190.66 for 1964 is not apparent from either the notice of deficiency or the trial record. However, that alone is not sufficient to establish that such determination was arbitrary or unreasonable. Petitioner failed to offer any evidence that an explanation of respondent's determination of unreported income for 1964 was not obtainable. If petitioner was in doubt as to the basis for respondent's determination here, the record discloses no effort on his part to ascertain it. Furthermore, petitioner offered no proof to establish that *102 such amount was incorrect or that it could be accounted for by adding to his reported income other amounts that were not properly includable therein. The failure of petitioner to present competent evidence on this issue means that respondent's determination must be sustained. 3. Contested Deductions
We will discuss the legal questions involved before turning to the specific deductions in question for each of the years at issue. a. Personal Expenses
In circumstances such as exist here, where there is a grave concern whether the expenses incurred by the taxpayer are personal rather than "in connection with his trade or business," it is entirely proper for the fact-finding tribunal to require adequate substantiation of the claim.Section 262 disallows any deductions for "personal, living or family expenses," and so the court must be convinced by the taxpayer that his expenses are not, in reality, merely personal. Deductions from gross income are purely a matter of legislative *103 grace and the statutory sections authorizing them "are to be strictly and narrowly construed." Oates v. Commissioner of Internal Revenue,316 F.2d 56, 58 (8th Cir. 1963). The burden is always upon the taxpayer to prove that his expenses fall within "the deduction provisions of the statute." Hirsch v. Commissioner of Internal Revenue,315 F.2d 731, 738 (9th Cir. 1963). [Mayrath v. Commissioner,357 F. 2d 209, 213-214 (5th Cir. 1966).] [Emphasis supplied; footnotes omitted.] Petitioner's testimony and exhibits leave little doubt as to the personal nature of many checks and estimates claimed as business expenses. For instance, petitioner made payments to various charitable organizations during the years at issue; he could not deduct these payments as itemized charitable contributions since he had elected the standard deduction. Instead, he labeled such payments as "promotion" and claimed them as businessexpense deductions. However, section 1.162-15, Income Tax Regs. specifically provides that such contributions may not be claimed as business expenses under section 162: *104 No deduction is allowable under section 162(a) for a contribution or gift by an individual or a corporation if any part thereof is deductible under section 170. Thus, in order to be entitled to a business deduction for these expenditures, petitioner had the burden of proving that each of the organizations to which a claimed payment was made was not a charitable organization within the class described in section 170. Such payments are deductible only if the foregoing requirement is met; they are neither deductible as "promotion" nor otherwise an allowable business expense even though petitioner may in good faith have felt that such payments would build or maintain goodwill for his medical practice. See Western Products Co.,28 T.C. 1196, 1217 (1957), where excess contributions were disallowed as advertising expenses. Many other claimed expenses, such as interest, utilities, taxes, insurance, etc., related to the Tara Ranch *105 and were therefore allocable in part to petitioner's personal residence. Sections 162 and 212 permit the deduction of expenses paid or incurred during the taxable year which are reasonable in amount and proximately related to a business or other income-producing activity. Petitioner failed to establish that he used more than one-sixth of his personal residence for business purposes. In light of the testimony which indicated that such business use was limited to the storage of medical supplies in a washroom and the infrequent examination of a patient in some other room, respondent's allowance of one-sixth seems reasonable, indeed generous. Real property taxes allocable to the personal residence cannot be deducted if the taxpayer elects the standard deduction, as he did here. Nor, in such a case, can he deduct state income taxes "* * * even though the taxpayer's income is derived from conduct of a trade or business." Sec. 1.62-1(d), Income Tax Regs.
b. Capital Expenditures
*106 Many of the checks introduced to substantiate business expenses represented capital expenditures and hence are not deductible. Sec. 263. Sec. 1.263(a)-2(a), Income Tax Regs., gives the following examples of capital expenditures: The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year. Petitioner admitted at trial that many of the items he purchased had a useful life greater than one year, and we hold that respondent's disallowance of the deductions claimed for the cost of such items was proper. c. Lack of Substantiation
Section 162 permits the deduction of certain ordinary and necessary business expenses. However, the taxpayer must first meet his burden of proof by showing that he is entitled to the deduction. Historically, such deductions have been strictly construed. See White v. United States,305 U.S. 281 (1938); Huene v. United States,247 F. Supp. 564, 570 (S.D. N.Y. *107 , 1965). Petitioner failed to substantiate the payment of part or all of the business expenses claimed in various categories in his returns for each of the years in question. At trial the Court frequently attempted to focus petitioner's attention on relevant matters and to explain that even though petitioner's canceled checks proved that an expenditure had been made, they did not show whether the expenditure was business or personal in nature and that respondent's determination would prevail unless petitioner submitted further evidence sufficient to prove the required business character of the payments at issue. [5] However, taxpayer consistently failed to heed the Court's instructions, to marshal the required evidence, or to apportion or prorate certain expenses; instead he took the position that it was respondent's duty to show that the claimed business expenses were not deductible. d. Entitlement To Additional Amounts Claimed At Trial
*108 Petitioner introduced checks and his own oral testimony at trial purporting to substantiate deductions in excess of those claimed on his returns in several categories for the years at issue. At the end of the trial, the Court advised petitioner that we could not allow deductions in excess of the amounts claimed in the returns unless petitioner amended his pleadings to conform with his proof, pursuant to Rule 41, United States Tax Court Rules of Practice and Procedure. The record shows that the Court explained what was required and why it was essential. Petitioner was allowed 60 days to file the necessary amendment, but he failed to do so. By failing to file any amended petition, petitioner must be deemed to have abandoned any claim he may have had for additional deductions beyond the amounts claimed in his returns. Because no claim was made in the original petition for a refund based upon additional deductions not claimed in the returns, nor was the petition amended to make such claim, such additional deductions cannot be allowed. Eugene Houdry,7 T.C. 666 (1946); M. C. Parrish & Co.,3 T.C. 119 (1944), affd. 147 F. 2d 284 (5th Cir. 1945). *109 e. 1964
Most of the business expense amounts allowable for this year were stipulated at trial, as indicated in the table on page 10 in our Findings of Fact. In two categories of expense ("Supplies & Other" and "Office & Miscellaneous") respondent allowed amounts greater than claimed by petitioner in his return, and we have likewise allowed such larger amounts. [6]
In his return for 1964 petitioner claimed a business expense deduction of $ 2,059.39 for interest. [7] Respondent allowed $ 1,690.47. At trial petitioner introduced canceled checks and receipts reflecting the payment of a total of $ 2,607.71 in interest, all of which petitioner claimed was business-related. Of this amount, a total of $ 1,435.50 was paid to the persons from whom petitioner purchased the Tara Ranch. Respondent contends that such interest related in part to petitioner's personal residence, and that, because petitioner has not attempted to show a proper *110 allocation of the interest as between the residence and the income-producing property, the entire $ 1,435.50 should be disregarded. Although it is true that petitioner did not attempt to so allocate the interest relating to the Tara Ranch, in our disposition of the depreciation issue hereinafter we have determined the portion of the cost of the Tara Ranch attributable to the personal use of the residence to be equivalent to 25.8 percent. [8] Thus, if 25.8 percent of the interest relating to the Tara Ranch (or $ 370.36) is eliminated from the total interest reflected in the canceled checks introduced into evidence, there remains a balance of $ 2,237.35 of business-related interest expense. This amount exceeds the total of $ 2,059.39 claimed by petitioner in his return. However, since petitioner failed to file an amended petition in this case, we cannot allow more than the amount placed in issue by the original petition. Accordingly, petitioner's originally claimed deduction of $ 2,059.39 is allowed, but no additional sum has been established as properly allowable herein. *111 Petitioner claimed a business expense deduction in 1964 for "Promotion" in the amount of $ 94.04. Respondent allowed only $ 51.76 of this amount. At trial petitioner introduced canceled checks totaling $ 254.04, purporting to represent expenditures for business promotion. The record shows that most of petitioner's claimed promotion expenditures were charitable contributions, which are not permissible business deductions, as discussed under subheading a., supra, or gifts to his wife's parents and other individuals, without an adequate showing of their business motivation. Accordingly, respondent's allowance of only $ 51.76 is found to be correct. f. 1965
Respondent stipulated at trial that the amount of $ 19,778.34 claimed in petitioner's 1965 return as "Labor" expense was allowable; we, accordingly, allow that deduction. Petitioner is entitled to a business deduction for "Merchandise, Supplies & Other" of only $ 6,727.26 as determined by respondent. At trial, petitioner introduced checks totaling $ 7,097.06 in an attempt to substantiate the amount claimed on the return, $ 8,327.26. Of these checks, $ 611.87 represented capital or personal expenditures. Further, petitioner *112 failed to substantiate the remaining $ 1,230.20 claimed. In his 1965 return petitioner claimed a business expense deduction for taxes in the amount of $ 6,315.98. Respondent allowed $ 3,213.94. At trial, petitioner introduced checks totaling $ 6,619.98, purporting to substantiate deductions for 1965 taxes, and respondent has conceded that all but $ 980.30 of this total represents deductible business expenses. We believe that respondent adequately established on cross-examination that the balance of $ 980.30 represented nondeductible personal expenses. Accordingly, petitioner is allowed a business expense deduction for taxes in the amount of $ 5,639.68. In his 1965 return petitioner claimed a business expense deduction of $ 2,762.41 for insurance. Respondent allowed $ 1,335.95. At trial, petitioner introduced checks totaling $ 2,508.47 in support of the claimed deduction; however, his testimony indicated that of this amount $ 337.12 represented nonbusiness expenditures. Accordingly, petitioner is allowed a business deduction of $ 2,171.35 for insurance. In his 1965 return petitioner claimed a business expense deduction for legal and professional fees in the amount of $ 580. Respondent *113 allowed $ 419.10. At trial, petitioner introduced checks totaling $ 2,311.50, purporting to substantiate deductions of that amount in this category. However, we need not determine the correct amount of this group of alleged business expenses because petitioner failed to file an amended petition; he abandoned a claim to such excess amount and waived any right to claim more than the $ 580 deducted in his return. Respondent has conceded that petitioner is entitled to deduct the $ 580 originally claimed, and we allow such claimed deduction. In his 1965 return petitioner claimed a business expense deduction for interest in the amount of $ 2,796.67. Respondent allowed $ 1,859.52. At trial, petitioner introduced canceled checks, purporting to substantiate business interest expenditures totaling $ 4,001.96. However, of this amount, $ 1,000 represented a payment to petitioner's father-in-law with no valid debt proved, and $ 1,834.05 represented interest paid with respect to the Tara property. Consistent with our treatment of the interest relating to the Tara Ranch in 1964, 25.8 percent, or $ 748.28, of such interest paid in 1965 must be deemed allocable to the personal use of the residence, *114 and thus, nondeductible. Accordingly, of the total amount reflected in the canceled checks, $ 1,748.28 is not deductible. The remaining balance of the canceled checks, $ 2,253.68, is deductible as business interest for 1965, and we so conclude. This is within the total claimed in the return. Petitioner claimed a business expense deduction in the amount of $ 257.96 for "Dues, Subscriptions, etc." Respondent allowed $ 43.51. Since petitioner offered no evidence as to this item, the amount of $ 43.51 allowed by respondent is found to be correct. Petitioner claimed a business expense deduction in 1965 for entertainment in the amount of $ 260. Respondent allowed only $ 56.94. At trial, petitioner introduced canceled checks, purporting to substantiate promotion expenses totaling $ 316.12, and he estimated that he expended an additional $ 30 per week (or $ 1,560 for all of 1965) for entertainment in his home and promotion. However, of the checks introduced, a total of $ 165.40 appears to represent nondeductible payments to various section 170 organizations and to relatives and other individuals, without an adequate showing of the business purpose for such payments; and $ 82.16 was for *115 reforestation (which amount petitioner acknowledged was erroneously included). Petitioner's estimate of $ 1,560 of promotion and entertainment expenses in addition to the checks introduced cannot be allowed without substantiation. Section 274(d). Accordingly, we hold that petitioner is allowed $ 68.56 for business entertainment and promotion for 1965. Petitioner is allowed deductions totaling $ 1,408.53 for "Repairs" and "Fuel & Auto" expenses, as claimed, since this amount was allowed by respondent in the statutory notice, even though petitioner substantiated only $ 740.64 at trial and claimed that he did not know where checks substantiating the remaining $ 667.89 could be found since he did not prepare the returns. Petitioner claimed a deduction of $ 1,977.96 for "Telephone & Utilities". Respondent allowed only $ 1,255.84. At trial petitioner introduced canceled checks totaling $ 1,969.16, representing payment of utility expenses. However, he conceded that $ 187 was allocable to his residence, and five-sixths of this amount (or $ 157.50) is attributable to personal use of the residence. Respondent conceded that the balance of the total of the checks introduced is allowable as *116 a business expense. Accordingly, we hold that petitioner is allowed a deduction of $ 1,811.66 for utilities. Petitioner claimed a deduction for 1965 in the amount of $ 1,319.30 for office expenses. Respondent allowed $ 114.54. Respondent has now conceded that petitioner is entitled to the amount claimed. Although petitioner introduced canceled checks purporting to show expenditures for office and miscellaneous expenses in excess of the amount originally claimed, he waived any right to deduct any such larger amount by his failure to file an amended petition, and, accordingly, we allow only the originally claimed amount of $ 1,319.30. g. 1966
In his return for 1966 petitioner claimed a deduction for labor in the amount of $ 19,235.89. Respondent allowed $ 11,156.66. At trial, petitioner introduced canceled checks totaling $ 19,191.99, purporting to substantiate business labor expenses. Respondent has conceded that $ 19,191.99 is allowable, and we therefore allow the deduction of that amount. Since there is no dispute regarding the amounts claimed for "Feed" and "Supplies", petitioner is entitled to the full $ 8,355.08 claimed. Petitioner claimed a business expense deduction *117 in his 1966 return for taxes in the amount of $ 4,708.98. Respondent allowed $ 3,506.11. Although petitioner introduced canceled checks totaling $ 6,457.20, purporting to substantiate deductible business expenses for taxes, he has waived any claim for a deduction in excess of the amount claimed in his return, by failing to file an amended petition, and respondent has conceded that he is entitled to the originally claimed amount of $ 4,708.98. We hold that that amount is deductible. Petitioner claimed a business expense deduction for insurance in the amount of $ 1,563.30. Respondent allowed $ 1,457.40. Petitioner introduced into evidence canceled checks purporting to substantiate a deduction for insurance totaling $ 1,553.10. However, $ 572 of this amount represented unallowable expenditures for disability insurance and for the nonbusiness portion of fire insurance on the Tara residence. Accordingly, we uphold respondent's original allowance of $ 1,457.40 for insurance. Petitioner claimed a deduction for 1966 in the amount of $ 929.02 for legal and professional expenses. Respondent allowed $ 457.20. Although petitioner introduced at trial canceled checks totaling $ 2,404.20, purporting *118 to substantiate a deduction for that amount, he waived any claim for a deduction greater than the amount claimed in his return, by failing to file an amended petition. Respondent has conceded that the originally claimed amount of $ 929.02 is allowable and we uphold that allowance. In his 1966 return petitioner claimed a business expense deduction for interest in the amount of $ 3,831.50. Respondent allowed $ 2,028.56. While petitioner submitted canceled checks purporting to substantiate $ 3,636.52 of interest paid, $ 1,000 of this amount represented interest paid to his father-in-law and $ 223.49 represented interest allocable to the nonbusiness portion of his personal residence, both not allowable for the reasons given in our discussion of the interest deduction claimed for 1965, supra, and $ 195.40 represented interest on a loan for the purchase of ten acres of raw land which was not proven to be related to any of taxpayer's trade or business activities. Accordingly, these nondeductible items must be eliminated from the total of $ 3,636.52 in canceled checks, and the remaining balance of such checks, $ 2,217.63, is deductible as business interest in 1966. Petitioner claimed *119 a business expense deduction in the amount of $ 1,040 for "Travel & Promotion". Respondent allowed $ 62.11. At trial, petitioner introduced canceled checks purporting to substantiate deductible expenditures for dues, subscriptions, travel and promotion, totaling $ 666.14, and he estimated that he expended an additional amount of $ 1,560 ( $ 30 per week) for business entertainment. Such estimate cannot be allowed without adequate substantiation. Sec. 274(d). Of the canceled checks introduced, a total of $ 401.66 represented personal expenditures and contributions to section 170 organizations not deductible as business expenses. (Among the more egregious examples of personal expenditures claimed was a check for $ 250 to petitioner's father-in-law in payment for an antique piano for petitioner's home and $ 71.76 for a wristwatch for petitioner's mother-in-law.) We hold, therefore, that only the balance of the checks introduced in this category, $ 264.48, represents deductible business expenses. In his 1966 return petitioner deducted $ 1,637.58 for "Gasoline, fuel, oil". Respondent allowed $ 1,229.03. At trial, petitioner introduced canceled checks purporting to substantiate a total *120 of $ 1,474.89 for business-related automobile expense. Respondent has conceded, and we hold that petitioner is entitled to deduct $ 1,474.89 for automobile expense. Petitioner deducted $ 2,099.23 in his 1966 return for "Utilities". Respondent allowed $ 1,370. At trial, petitioner introduced canceled checks totaling $ 2,091.48, purporting to substantiate business-related utilities expense. Petitioner conceded that $ 187 of the total checks introduced related to utilities for his residence, of which five-sixths, or $ 155.83, must be attributed to personal use. Accordingly, we hold that petitioner is entitled only to a deduction of $ 1,935.65 for utilities. In his 1966 return petitioner deducted $ 2,124.74 for office expenses. Respondent allowed $ 124.96. At trial, petitioner introduced canceled checks totaling $ 1,908.44, purporting to represent payment of office expenses; however, he conceded that $ 50 of this amount was for food personally consumed. We hold that the balance of $ 1,858.44 is deductible as allowable office expenses. A business deduction of $ 1,815.43 for "Repairs and maintenance" as allowed by respondent in the statutory notice is sustained, even though petitioner *121 only presented checks totaling $ 1,364.91 at trial to substantiate his total cliam for $ 2,269.29; respondent having allowed the greater amount of $ 1,815.43, we hold that amount is a proper deduction in this category of business expenses. Since petitioner proved at trial that he made "Refunds" of $ 92 to clients in 1966, this amount is allowed instead of the $ 98 claimed. In his 1966 return petitioner claimed a deduction of $ 4,714.18 for "Machine hire". Respondent allowed $ 3,771.34. At trial, petitioner introduced checks totaling $ 10,082.49, purporting to substantiate expenditures relating to his logging operation. We need not determine how much of this total might be properly allowed since petitioner failed to file an amended petition, and thereby waived any right to a deduction greater than the amount claimed in his return. The $ 4,714.18 originally claimed is allowed as established. In his 1966 return petitioner claimed a deduction of $ 124.27 for "Trespass". Respondent allowed $ 99.42. Since petitioner failed to prove entitlement to a greater amount, respondent's determination must stand. 4. Depreciation
Respondent disallowed the following amounts of depreciation *122 for the years at issue: 1964
$ 4,290.49
1965
3,822.02
1966
5,930.01 Depreciation was allowed as claimed on trucks and automobiles, the differences herein arising chiefly from different depreciable bases and depreciation rates for other items. The primary cause of the depreciation disallowance related to respondent's reallocation of basis between land and improvements for petitioner's office and the Tara Ranch. The cost of the office building ($ 14,500) and the Tara Ranch property ($ 48,500) must be apportioned between land and improvements in accordance with the relative values of the properties. Sec. 1.167(a)-(5), Income Tax Regs. Despite petitioner's unfounded contention that the respondent could not overturn petitioner's allocation for depreciation purposes without first showing that taxpayer's allocation, made on first-hand knowledge, was erroneous, the burden in fact remained on petitioner to prove that respondent's allocation was erroneous. This issue of valuation is purely factual, and petitioner failed to present any support for his self-serving testimony regarding his allocation of the costs of the office and Tara properties between land and improvements. *123 When petitioner acquired the office building property in 1964, he allocated $ 10,000 of the purchase price to the existing building, for depreciation purposes, and the balance of $ 4,500 to land. In recomputing allowable depreciation respondent allocated $ 10,440 to the land and $ 4,060 to the building, and petitioner's testimony has not established that this allocation was improper. In fact, the record shows that petitioner spent $ 13,414.77 to renovate the building after he acquired it, and he testified that in the process of renovation, most of the original structure was destroyed. Such testimony is quite inconsistent with petitioner's allocation of nearly 70 percent of the total cost of the property to the original building. The following table shows the allocation of the cost of the Tara Ranch as made by petitioner; as determined by respondent in the statutory notice; and as revised by respondent on brief, based upon relative values for real estate tax purposes: Statutory
Respondent's Brief
Petitioner
Notice
Amount
Percent
Land
$ 4,200
$ 16,635.50
$ 10,524
21.7
Non-residential
buildings
44,300
8,522.50
11,239
Residence
Personal use (5/6)
12,500.00
12,500
54.1
Business use (1/6)
2,500
2,500
Personal property
8,342.00
11,737
24.2
$ 48,500
$ 48,500.00
$ 48,500
100.0
*124 The basis of respondent's original allocation in the statutory notice is not clear from the record. However, at trial petitioner introduced the 1961-62 county real estate tax bills relating to the property, and on brief respondent has reallocated the total cost as between land (21.7%), improvements (54.1%) and personal property (24.2%), in the same relative proportions as the assessed values for those three elements reflected in such real estate tax bills. Such an approach has been recognized by this Court as an acceptable means of allocating the basis of property as between land and improvments. 2554-58 Creston Corp.,40 T.C. 932, 940, fn. 5 (1963); Norman Baker Smith,51 T.C. 429, 441 (1968). Of the portion thus allocated by respondent to the improvements, $ 15,000 was allocated to the residence, based upon petitioner's having insured it in that amount, and the balance of $ 11,239 was allocated to the other ranch buildings. One-sixth, or $ 2,500, of the amount allocated to the residence was determined to be attributable to business use. In the absence of a showing by petitioner to the contrary, we find that respondent's proposed allocation of the costs of *125 the office property and the Tara Ranch are reasonable, and such allocations are approved. The foregoing reallocation increases the allowable basis for depreciation on the non-residential ranch buildings which, based upon the uncontested depreciation rate of 8 percent, entitled petitioner to a depreciation allowance in excess of that allowed in the statutory notice for these buildings, in the amount of $ 217.32 for each of the years 1964 through 1966, inclusive. The following table sets forth the annual depreciation rates (based upon the declining balance method) claimed by petitioner for the office building, office equipment and ranch buildings: 1964
1965
1966
Office building
5%
10%
10%
Office equipment
10%
20%
20%
Ranch buildings
8%
8%
10% In determining the allowable depreciation for each of the three years, respondent adopted the depreciation rates originally claimed by petitioner in his 1964 return. At trial petitioner conceded that the 8 percent rate for the ranch buildings was correct. With regard to the office building and office equipment, petitioner failed to establish useful lives which would support the claimed depreciation rates *126 in 1965 and 1966 of double those claimed in 1964, as allowed by respondent. Accordingly, respondent's determinations must be upheld. After being permitted to examine Dr. Lysek's records, respondent conceded at trial that petitioner was entitled to a depreciation deduction for cattle held during 1965 of $ 168. We also find that petitioner is entitled to an additional deduction of $ 50 for 1966, representing four months depreciation for cattle purchased September 16, 1966, for $ 745, having a useful life of five years. Based on these findings, we hold that petitioner is entitled to depreciation deductions of $ 6,005.50 for 1964, $ 6,252.72 for 1965 and $ 5,305.04 for 1966. 5. Investment Credit
In his return for 1966, petitioner claimed an investment credit based upon his purchase of a caterpillar tractor at a cost of $ 10,400. Respondent disallowed the claimed credit for lack of substantiation. Respondent has conceded that such disallowance was incorrect; however, at the time of making such concession, at trial and on brief, respondent asserted that the amount of the investment credit at issue and being conceded was only $ 384.65. We are unable to determine from the record *127 how respondent arrived at this particular amount. However, since respondent's concession as to the allowance of the investment credit was limited to $ 384.65, it is necessary to determine whether petitioner has established that he is entitled to a greater amount. In Form 3468 attached to his 1966 return, petitioner computed a tentative investment credit in the amount of $ 728, [9] based upon the $ 10,400 cost of the tractor, and a claimed useful life of eight years or more. However, petitioner presented no evidence as to the useful life of the tractor. We, therefore, have no basis for allowing the computation of the credit on the basis of any useful life which would result in a credit greater than the amount conceded by respondent. Accordingly, we conclude that petitioner is only entitled to an investment credit for 1966 in the amount of $ 384.65. 6. Fair Market Value of Standing Timber for Section 631(a) Purposes
On his 1966 return, petitioner reported a long-term capital gain ($ *128 20,325), income from the sale of timber ($ 24,255.51) and a deduction for "stumpage" ($ 20,325). By so doing he elected the benefits of section 631(a). Sec. 1.631-1(c), Income Tax Regs. This section allows certain taxpayers to treat the difference between the basis of certain timber cut during the taxable year and its fair market value on the first day of such year as a gain or loss from a sale or exchange of a capital asset under section 1231. This fair market value then becomes taxpayer's cost for such timber for computing gain or loss upon its subsequent sale. The gain or loss resulting from such sale is ordinary in character. In the statutory notice respondent eliminated the capital gain and the stumpage deduction for failure to establish entitlement to section 631 treatment. However, in view of the facts presented at trial, the section 631 election was allowed, and the only remaining issue relates to the fair market value of the standing timber on January 1, 1966, which was cut and sold by petitioner during 1966. Since petitioner allocated no portion of the purchase price of the Tara property to the standing timber, he had no basis therein. Therefore, *129 he realized a capital gain in an amount equal to the fair market value of the timber which he cut in 1966, valued as it stood on January 1, 1966. This value may also be claimed by petitioner as the cost ("stumpage") of this timber upon its later sale in 1966. Petitioner claims that approximately 660,000 gross board feet of timber was cut on the Tara property during 1966, and that it had a total value of $ 20,325, or about $ 30 per thousand board feet. Respondent's position is that the standing timber had a value of $ 17 per thousand board feet, and this value applied only to the extent of 491,620 board feet of net merchantable logs obtained from the timber cut, or a total value of $ 8,357. Petitioner based his valuation upon the average price offered for timber from the Hare Creek Sale Number 1 at Jackson State Forest, contiguous to the northern boundary of petitioner's tract; upon two timber trespass awards, the first awarded petitioner and the other assessed against him when one of his choppers inadvertently crossed the property line and cut on the adjoining property; and upon petitioner's personal opinion and that of Watkins, his "tax adviser", the man who prepared his tax returns. *130 Petitioner did not attempt to qualify himself as a timber valuation expert, and his testimony was, no doubt, affected by his desire to minimize his taxes. The testimony of Watkins on the issue of valuation was likewise of virtually no assistance to the Court in making its factual determination of value. He did not state the factors considered, the comparables relied upon or the method used to arrive at his conclusion. By comparison, respondent presented two well-qualified timber valuation experts and questioned them in detail as to the bases for their determinations. The Court was satisfied with their qualifications and, although petitioner disputes the value of their testimony on the grounds that they were non-independent employees of respondent, we found their testimony to be helpful and soundly based. In proving the value of petitioner's timber, one expert, May, used the conversion return approach. [10] He also valued the timber based upon personal inspection of the taxpayer's property, his extensive experience in the timber industry and consideration of many comparable properties, all discussed at length in the record. The other expert, Rueger, while employed in private industry, *131 had actually inspected and appraised the timber in the Hare Creek Sale Number 1 area when it was offered for sale in 1965. He also personally inspected petitioner's timberlands on the Tara property. In addition, both men presented more than a dozen photographs illustrating the relative sizes of the timber on the Hare Creek and Lysek properties. These vividly illustrated the differences between the logs cut, since it could easily be seen that most of the trees left standing on the Hare Creek property were the size of the ones cut on the Lysek property. Respondent's experts also testified concerning five timber sales during 1965 and 1966 in which timber comparable to petitioner's sold at prices ranging from $ 8 to $ 18 per thousand board feet for redwood and $ 15 to $ 20 per thousand for Douglas fir. Based upon the entire record and the testimony *132 of respondent's two expert witnesses, we have found that the fair market value of petitioner's timber as it stood on January 1, 1966, which he cut and sold during 1966, was $ 14 per thousand board feet for redwood and $ 20 per thousand board feet for Douglas fir, an average of $ 17 per thousand board feet of net merchantable logs delivered to the mill. In reaching this figure we gave careful attention to the factors enumerated in section 1.611-3(f)(1) and (2), Income Tax Regs., entitled "Determination of fair market value of timber property." Although this finding of fair market value is at variance with the $ 30 per thousand board feet price which was paid in the Hare Creek sale (for timber on property adjoining petitioner's) and in two timber trespass awards in which petitioner was involved, there are several reasons why such $ 30 price is not representative of fair market value for purposes of this case. Respondent's experts proved to the Court's satisfaction that the Hare Creek sale consisted chiefly of old-growth timber which provided a higher grade of lumber than the second-growth timber of small diameter taken from petitioner's property. Thus, the prices secured for the Hare *133 Creek timber were of limited value as a comparable sale in determining the value of petitioner's timber. The record does not indicate the manner in which the $ 30 timber trespass awards, relied upon by petitioner, were arrived at. In the absence of evidence to the contrary, we must conclude that such awards represented more than just the fair market value of the standing timber. Under California law timber trespass awards are punitive in nature and not remedial. See Cal. Civ. Code section 3346 (West's 1970); Drewry v. Welch,236 Cal. App. 2d 159, 46 Cal. Rptr. 65 (1965); United States v. Vollweiler,229 F. Supp. 558 (N.D. Cal., 1964). California law clearly establishes that the landowner is entitled to recover the profit made by the trespesser in addition to the value of the timber cut. Crofoot Lumber, Inc. v. Ford,191 Cal. App. 2d 238, 12 Cal. Rptr. 639 (1961). Thus, the $ 30 price involved in the two timber trespass awards is not necessarily determinative of the fair market value of the standing timber. Based on the 491,620 *134 board feet of net merchantable logs, which are the only logs which can be considered as sold or exchanged, sec. 1.631-1(d)(1), Income Tax Regs., petitioner had a long-term capital gain of $ 8,357 for the year 1966. This sum is also the amount of his stumpage deduction. Taxpayer cannot include the 168,380 board feet of defective timber left in the field and not trucked to the mill, as this cannot be considered as sold and exchanged during the year. This is clear from a reading of the regulation just cited and from industry practice. The record shows that timber companies attribute no value to the defective logs left in the field and pay only for logs delivered on a net merchantable log scale basis. 7. Additions to the Tax
Respondent determined additions to tax as provided in section 6653(a) for the years 1964, 1965 and 1966. The burden of proving that the imposition of this addition is erroneous is petitioner's. David Courtney,28 T.C. 658, 669 (1957); Joseph Marcello, Jr.,43 T.C. 168, 182 (1964), affd. on this issue, 380 F. 2d 499 (5th Cir. 1967). For the reasons given below, we find that the deficiency *135 for each of the years 1964, 1965 and 1966 was due at least in part to negligence or intentional disregard of rules and regulations, within the meaning of section 6653(a), and that the imposition of the five percent addition to the underpayment determined is warranted by the facts and must be upheld. The record shows that petitioner more often than not could not substantiate the amounts claimed on his returns. Most often, the checks offered in evidence were less than the amounts claimed; occasionally the gap was considerable. In some cases, the checks offered were in excess of the amounts claimed. And in no category for any year did the sum of the checks offered in proof equal the amount claimed on the return. Such a pattern raises the question of what, if any, detailed records were relied on in determining the amounts claimed on his returns. It indicates negligence either in the keeping of required records or in the preparation of the returns. Such negligence renders petitioner liable for the additions to tax under section 6653(a). Watson-Moore Co.,30 B.T.A. 1197, 1207 (1934). *136 In any event, since petitioner introduced no evidence in regard to this matter, respondent's determination is sustained. James S. Reily,53 T.C. 8, 14 (1969). Ample evidence also exists of intentional disregard of the law. Petitioner attempted to deduct gifts of money and a watch, as well as payment for a piano, to his wife's parents. Unsubstantiated payments to small children were claimed as business expenses or farm losses. Expenses for petitioners' personal residence were claimed in their entirety as business expenses, even though only one-sixth of the residence could reasonably be deemed used for business purposes. While taking the standard deduction in the years in question, petitioner attempted to deduct also many of his personal expenses, such as contributions, medical insurance and interest, as business expenses. Both the taxpayer, a sophisticated and well-educated professional man, and his tax adviser knew or should have known that such personal items were not deductible as business expenses. Where a taxpayer knowingly deducts personal expenditures as business *137 expenses, he is subject to the section 6653(a) addition to tax. Humphrey v. Commissioner,162 F. 2d 853 (5th Cir. 1947), affg. on this point a Memorandum Opinion of this Court, cert. denied 332 U.S. 817 (1947). Further, petitioner cannot avoid his duty of filing accurate returns; he is responsible for the failure of his agents. American Properties, Inc.,28 T.C. 1100, 1116, affd. per curiam 262 F. 2d 150 (9th Cir. 1958). The deficiencies alleged should be recomputed, taking account of the concessions and the findings herein. As for those errors alleged in the petition but ignored by the petitioners at trial, respondent's determinations, being presumptively correct, are approved and should be reflected in the recomputation. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioners conceded that they are entitled to an investment credit of $ 1,009.93 for 1964, in lieu of the $ 2,053.51 claimed on their return. Respondent conceded that petitioners are entitled to a partnership loss of $ 1,315.01 out of the total partnership loss of $ 4,009.01 claimed on their 1966 return.↩
3. After examining petitioners' books and records prior to trial, respondent reduced 1966 unreported income from the $ 6,242.83 set forth in the statutory notice to $ 2,141.19.↩
4. References in this opinion to petitioner or taxpayer are to Edward T. Lysek. His wife is a party solely because joint returns were filed for the years in question.↩
*. Price per thousand board feet of net merchantable logs.↩
2. At trial, Dr. Lysek stipulated that respondent's determination as to these categories was correct. ↩
5. Feed Purchased and Supplies Purchased were consolidated for this year in the statutory notice as Feed & Supplies. ↩
6. Petitioner's Car & Travel Expense (1964); Repairs Fuel & Auto Expenses and Travel Expenses (1965), and Gasoline (1966). Respondent's Auto & Travel in his statutory notices.↩
1. This category was added by respondent in his statutory notice of deficiency to petitioner. ↩
3. Respondent stipulated at trial that the amount claimed was correct. ↩
4. Materials & Supplies and Other Costs were consolidated for this year in the statutory notice as Merchandise, Supplies and Other. ↩
1. Consists of original cost of $ 4,060 plus subsequent improvements of $ 13,414.77. ↩
2. Includes nonresidential buildings with a basis of $ 8,522.50 plus the business portion (1/6) of the residence, $ 2,500.↩
5. In numerous instances respondent accepted as deductible all but the most obviously nonbusiness expenditures reflected in petitioner's canceled checks. In reviewing these checks, we consider respondent's concessions quite generous.↩
6. With respect to the category "Supplies & Other" petitioner attempted at trial to substantiate expenses greater than the amount allowed by respondent; however, he waived his claim to any additional amount by failing to file an amended petition.↩
7. Since petitioner claimed the standard deduction in lieu of itemized nonbusiness deductions, his interest expense could be deducted only to the extent that it qualified as a business expense under section 162↩. 8. $ 12,500 out of a total cost of $ 48,500.↩
9. The portion of the tentative credit actually utilized in the return was $ 376.10, equal to the amount of petitioner's tax liability as computed before reduction by the investment credit.↩
10. The so-called "conversion return" approach is a common method of estimating fair market value of standing timber by starting with the price at which the logs could be sold at the mill and reducing this by the estimated costs of cutting, loading and transportation, and by a percentage factor (in this case, 13 percent) for profit and risk.↩