Jack M. Gamble and Rose Gamble v. Commissioner.
Gamble v. Commissioner
Docket No. 78294.
United States Tax Court
T.C. Memo 1960-238; 1960 Tax Ct. Memo LEXIS 52; 19 T.C.M. (CCH) 1343; T.C.M. (RIA) 60238; November 8, 1960
Charles H. Haines, Jr., Esq., Equitable Building, Denver, Colo., for the petitioners. Emory L. Langdon, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $5,197.47 in the income tax of the petitioners for 1955. The only issue for decision is whether an admitted loss is deductible in full or is limited to short-term capital loss treatment as a nonbusiness bad debt. Findings of Fact The petitioners, husband and wife, filed a joint Federal income tax return for 1955 with the district director of internal revenue at Denver, Colorado. Jack worked with his father in the maintenance and repair of large pieces of machinery before graduating from high school, and thereafter for 2 years he engaged in land plowing and leveling as a sole proprietor. *53 He obtained, used and maintained his own caterpillar tractors and plows in this business. He employed a tractor driver who also assisted him with the repairs. He then moved to California where he worked as a driver and mechanic for a trucker, operating and doing all of the repair on heavy diesel trucks. He bought a truck terminal in San Francisco in the latter part of 1935 and operated 5 trucks on a transportation route. He leased space in the terminal to other truck lines, sold them fuel and did most of their maintenance work himself. He sold this sole proprietorship in January 1937 at a profit of about $17,000. He later became superintendent in charge of maintenance of a fleet of over 500 trucks used by an oil company. He left this employment in December 1941 and went with the Pacific Naval Air Base as a master mechanic. His work was in Samoa where he was in charge of the maintenance of trucks, shovels, draglines and rock crushers used in the construction of air bases and roads. He had about 200 people working under him. There was always a shortage of parts and he repaired and rebuilt equipment by the use of parts from other abandoned equipment. He returned to California and operated *54 a small shop in Los Angeles in partnership with another man for about 2 months, repairing and rebuilding heavy duty trucks. Thereafter he went to Honduras as a truck foreman and later master mechanic for a firm building the Pan American highway, supervising all of the maintenance of heavy duty trucks, shovels and scrapers. He returned to his partnership repair shop in Los Angeles in 1944. There was a scarcity of equipment and the partners were forced to improvise and build up equipment for various hauling companies. Sometimes they had to fabricate the necessary parts. The partnership was discontinued 4 or 5 months later, and Jack, who had known Jenkins, opened a Phoenix, Arizona, branch for J. T. Jenkins Company, distributors of Kenworth trucks. Jack had a building constructed, he organized and installed a shop with a crew and had a parts department. He sold and serviced heavy duty motor trucks. The success of salesmen in this field depends upon their knowledge of the capacity and function of the heavy duty equipment in construction and highway work. Jack advised his customers on purchases and on maintenance which he supervised. This arrangement continued for about 4 years until *55 he left and with some friends organized the Gamble Equipment Company and bought the assets of the Kenworth truck distributors in Denver. Jack owned one-half of the 5,000 shares of stock which had a cost of $1 per share. The business was commenced on January 1, 1949 and continued until 1953 when, because of the difficulty of financing a rapidly expanding inventory, Jack decided to dissolve and liquidate the corporation. He had an automobile accident in December 1952 which incapacitated him for about 6 months. Kenworth agreed early in 1953 to buy all of the new assets of Gamble Equipment Company and to operate the business as a company branch. The Kenworth franchise was surrendered in May 1953, at which time the stockholders received $32 per share. Jack took over the used truck inventory and the accounts receivable and liquidated them. Heavy duty diesel transportation equipment had not been accepted in the Denver area. Some truck lines hesitated to pay the high prices for it or could not finance it, so Jack organized Equipment Leasing Company in 1951 in order to demonstrate the economic worth of the large diesel equipment by taking the economic risk of ownership and leasing the trucks. *56 The stockholders of Gamble Equipment Company also became stockholders of this company. Maintenance and repair service was a major factor in the economic operation of such equipment. Jack made studies for potential customers of Gamble Equipment Company and Equipment Leasing Company to show the estimated cost of fuel, maintenance and depreciation. Such studies aided in making leases and sales. Equipment Leasing Company was liquidated in 1954 at a substantial profit to its stockholders. Gamble Equipment Company made a number of truck sales prior to May 1953 as the result of this operation. Jack returned to Phoenix shortly after leaving the hospital in 1953 and was engaged by the New Mexico Timber Company. They were buying a number of Kenworth trucks and trailers and Jack supervised the equipment and had an agreement that he was to have an equity interest in the trucks and trailers when the purchase price had been paid. He also received a salary for his services. He was able to make a worthwhile reduction in the cost of operating the equipment, but this operation terminated after about 3 months because the company could not obtain a renewal of its stumpage agreement. Jack interested *57 a number of contractors in the Phoenix area in 1953 in a plan to construct air bases in Spain through a joint venture. He spent considerable time making studies of the equipment needs, and he made 2 trips to Washington on behalf of the proposed joint venture, but it was concluded in 1954 that the job was too large for the group and no contracts were secured. W. E. Orr, Sr., and W. E. Orr, Jr., partners, asked Jack in June 1953 to join them in a highway construction job in Arizona. They were engaged in the heavy construction business. Jack agreed and advanced $25,000 in cash to the partnership shortly after which it was decided to form a corporation, and Orr and Orr Construction Company was incorporated in June 1953. Jack was to receive 45 per cent of the stock but the only stock ever issued consisted of 3 qualifying shares, one of which was received by Jack. The three men became officers of the corporation. There was no provision for a salary for Jack and he never received any compensation from the corporation. The corporation applied for a $456,686.50 performance bond from Employers' Liability Assurance Corporation, Ltd., in order to obtain from the Arizona Highway Department *58 a contract to construct a highway near Sholow at an estimated contract price of $417,000. The bonding company required Jack's personal signature on the agreement. The corporation purchased 2 Kenworth trucks in August 1953 for $45,849.82, payable in two installments, and gave a chattel mortgage and its promissory note to Kenworth Truck Company. Kenworth required Jack to endorse and guarantee the payment of the note. Jack owned a substantial amount of heavy equipment which he leased. Part of it was leased to Orr and Orr Construction Company on the aforesaid job. Jack devoted 50 or 60 per cent of his time to the road building contract in 1953 and a larger portion thereafter. W. E. Orr, Jr., was a close friend of Jack's and lived in Jack's home. They had an understanding first that Orr would name the partnership as beneficiary of his life insurance and later that the corporation would be named as beneficiary. This was in order to protect Jack and Orr' father. Orr, Jr., was married in May 1954 and was killed in an automobile accident on June 7, 1954. It developed that he had changed the beneficiary of the insurance to his wife without disclosing this fact. It was discovered after his *59 death that he had substantially overestimated the amount of work completed on the road construction at Sholow and the corporation was insolvent. The bonding company terminated the connection of the corporation with the road contract in June 1954 and requested Jack to finish the work. He completed the work in October 1954. He did this, without receiving any salary or any rental for his own equipment used on the job, in order to reduce his liability on the indemnity bond and to complete the job for his own business reputation. Jack made a trip abroad in the latter part of 1954 where in partnership with an Egyptian engineer he investigated and bid on construction projects. These activities were abandoned in the spring of 1955 due to political circumstances. Jack on that trip met the manufacturer of the Yumbo Shovel and other movement equipment then widely used in Europe. He had a pilot model of the shovel sent to him and he studied it with the idea of converting it to American manufacture. He formed a corporation in December 1955 to promote this project. Jack had an opportunity in April 1955 to acquire a distributorship of the Diamond T truck, and he decided to have Gamble Equipment *60 Company use it. The other stockholders of that company were bought out and Jack became its sole stockholder. It was important in this connection that he settle his obligations to the bonding company and to Kenworth incurred in connection with the Arizona road construction work. Jack settled his liability with the bonding company on May 26, 1955, by the payment of $25,000 for the release of all claims against him under the indemnity agreement. Orr and Orr Construction Company did not pay in full for the 2 Kenworth trucks, and Jack settled the claim against him for their purchase price by the payment of $10,000. The actual money or credit for the $35,000 which Jack paid in 1955 was obtained by him through Gamble Equipment Company which charged these amounts to his account. Jack had income from Gamble Equipment Company and Equipment Leasing Company in 1954 and 1955. The Commissioner, in determining the deficiency, held that the $35,000 which Jack paid and deducted on his return as an ordinary loss "constitutes a nonbusiness bad debt, deductible as a short-term capital loss. Accordingly, income is increased by $35,000.00." The $35,000 was a business bad debt. All stipulated facts *61 are incorporated herein by this reference. Opinion MURDOCK, Judge: The decision in this case turns upon whether or not the losses in question were proximately related to a business conducted by the petitioner or whether they were nonbusiness bad debts. Putnam v. Commissioner, 352 U.S. 82; section 166, Internal Revenue Code of 1954. The Commissioner contends that the petitioner was not engaged in the business of lending money and was not engaged in the business of financing corporations. The petitioner does not contend to the contrary and does not claim the deduction on either basis. The petitioner has described briefly at least 17 activities in which he participated from the time of his graduation from high school (apparently about 1930) through 1955. Each had to do with the sale, rental, repair, use, or some combination thereof, of heavy earth-moving or transportation equipment. He used his funds and credit as they were needed in the organization and operation of these businesses and he devoted his personal abilities, experience, initiative, energy and services to them. He was by no means a mere "passive investor" in these enterprises but *62 he personally was a most important factor in each. He investigated a number of possibilities in this general field into which he never actually entered. He sometimes operated as a proprietor, sometimes as a partner and sometimes as an officer and stockholder. Some of the enterprises were interrelated. His activities were extensive, continuous and regular in this field to which he devoted his life and from which he gained his livelihood. There may be difficulty or difference of opinion in giving a proper definition of his business, but a reasonably consistent pattern of his business is discernible. Cf. Henry E. Sage, 15 T.C. 299. The use and preservation of his personal credit were important parts of his business, and the losses in question were not only proximately but directly related to that business. The loss is not to be regarded as a nonbusiness bad debt merely because a corporation was involved in the particular work in which the losses were sustained. The petitioner was approached by the Orrs, father and son, who were partners and wanted to engage in the construction of roads in Arizona. The petitioner advanced $25,000 in cash to the partnership and agreed to *63 participate in the undertaking. No loss is claimed here on that $25,000 investment. The petitioner deyoted a substantial part of his time to the undertaking during the next 2 years without any arrangement for salary. He also put a substantial amount of his equipment into the operation for which he was to receive rental but actually never received any because of the default which occurred in June 1954. A corporation was organized but the work was carried on without following the usual corporate formalities. Jack was to receive, but never received, 45 per cent of the stock. Only 3 qualifying shares were issued. The work on one contract resulted in the insolvency of the corporation in June 1954 and the bonding company had the petitioner finish the work as an individual. He took over and finished that work personally in order to mitigate his losses and to preserve his good reputation and credit in the heavy equipment field. $25,000 of the loss resulted because the bonding company had required the petitioner to go on the indemnity bond to cover the work contract. It is obvious that the petitioner had a large personal stake in these road construction contracts entirely aside from his temporary *64 interest in the Orr and Orr Construction Company. He suited his precise form of activity to the current opportunities. Those activities are distinguishable as a business from the business of that particular corporation, and it is not too difficult to hold, under the Code and the decisions, that the losses of $35,000 which he sustained as the result of his two guaranties were business rather than nonbusiness bad debts. No close factual parallel is to be found in any cited case, and this case is decided upon its own particular facts for the petitioner. Decision will be entered under Rule 50.