SYLVIA LUBRANO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lubrano v. Commissioner
Docket No. 3549-81.
United States Tax Court
T.C. Memo 1984-14; 1984 Tax Ct. Memo LEXIS 654; 47 T.C.M. (CCH) 855; T.C.M. (RIA) 84014; January 10, 1984. Harvey R. Zeller, for petitioner. Daniel K. O'Brien, for respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies of income tax for the years 1972 and 1973 against Edward Lubrano and Sylvia Lubrano (petitioner herein) in the respective amounts of $32,867.05 and $75,231.87. Respondent also determined additions to tax under section 6653(b) [1] against Edward Lubrano alone, in the respective amounts of $16,433.53 and $37,615.94. *655 The parties having stipulated that respondent's adjustments to income and computation of tax are correct, that the understatement of gross income in each of the 1972 and 1973 joint returns was in excess of 25%, and that all unreported income involved herein was the separate income of Edward Lubrano, the sole issue remaining for us to decide is whether petitioner should be relieved from liability with respect to tax deficiencies and interest for the years 1972 and 1973 as an innocent spouse within the meaning of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated, and such facts, together with attached joint exhibits, are incorporated herein by this reference. At the time of filing her petition herein, petitioner Sylvia Lubrano was a resident of Red Bank, New Jersey. Edward Lubrano has filed no petition with the Court with respect to the years 1972 and 1973, and is not a party herein. Petitioner, a native of England, came to this country in 1958. She was then 17 years of age, was married, and had two children. She had the equivalent of an American high school education. After arriving in the United States, petitioner held various rather modest *656 jobs, including that of a salesgirl, a hostess at a restaurant and the social director at an adult retirement community. In the late 1960's, petitioner was divorced from her then husband and as a result of that divorce she received title to the home in which she lived, located at 6 Hillwood Road, East Brunswick, New Jersey. In June of 1972, petitioner met Edward Lubrano (hereinafter "Edward"). She did not know his exact age, but he impressed her as a man of means and prominence in the local community, expensively dressed, carrying large amounts of money on his person, having a chauffeur-driven car and housekeeper, and representing to her that he had a boat, an airplane pilot's license, and owned a number of companies. A whirlwind courtship apparently ensued, and six weeks later, petitioner married Edward. Petitioner then quit her job, and Edward moved in with petitioner at her house in East Brunswick, New Jersey. Shortly thereafter, Edward prevailed upon petitioner to put the house in their joint names, and petitioner also turned over to Edward all the money which she had in her personal savings account. At the time of her marriage to Edward, petitioner's minor children *657 were attending public school. After their marriage, petitioner's son attended private school for about a year, and petitioner's daughter was sent to a Catholic school. The respective tuition fees were paid by Edward. In connection with their marriage, petitioner received an engagement ring from Edward, and they had a honeymoon trip together. Some six months later, Edward gave her a new automobile. However, at about the same time, he took petitioner's own automobile, which she had previously purchased, and gave it to one of his daughters by a prior marriage. After their marriage, Edward gave petitoner some cash every week to operate the household. He took care of paying bills such as utilities, mortgage payments and real estate taxes himself. Petitioner and Edward did not entertain extensively, and he did not give her any expensive clothing, jewelry or furs. From time to time, Edward would take petitioner with him to luncheon meetings with various business associates. At the time of petitioner's marriage to Edward, he owned a six and a half acre tract of land at Colts Neck, New Jersey, on which he was arranging to build a house. He caused title to this property to be *658 placed in the joint names of himself and petitioner, and thereafter completed construction of the house, into which he and petitioner moved in 1974. The house had about 12 rooms, and there were a couple of ponds and a stream on the property. During the years in issue, Edward was apparently engaged in the plumbing and excavating business, and carried on these activities through a variety of organizations or names, including the following: Lubrano Industries, Inc.; Lubrano Plumbing Co.; C&L Inc.; C&L Excavating; Colt Construction Corp.; and Lake Holding Co.[2]
During a period of two months beginning at about the time of her marriage to Edward, petitioner was given a power of signature on Edward's personal checking account, and was also given power of signature *659 on separate bank accounts opened in the name of Lubrano Industries, Inc., and C&L, Inc. Although certain of these accounts carried petitioner's name as an officer, she was neither an officer, shareholder or employee of any of these entities. Petitioner made no deposits to nor withdrawals from any of these accounts, with the following exceptions: A. With respect to the personal account maintained in the name of petitioner and Edward, petitioner endorsed for deposit certain checks which went into this account in 1972 and 1973. These checks represented income to one or more of Edward's companies. [3]
b. In the year 1973, petitioner drew two checks, totalling $28,000, on the personal account maintained with Edward, and a third check drawn on the C&L, Inc. account, in the amount of $4,000, in payment for a used boat which was purchased by Edward and titled in his name. She also drew a check in the amount of $3,120 on the C&L, Inc. account, in part payment for the automobile which Edward had promised her as a wedding present. *660 During her marriage to Edward, petitioner knew nothing about Edward's business affairs, except a general idea as to the line of work he was engaged in. If he told her to endorse checks for deposit, she did so, and if he instructed her to draw checks for certain purposes, she complied. She did not examine the bank statements on the various accounts where she had power of signature, did not pay attention to the source of the funds coming into the accounts, and did not have custody of the checkbooks or reconcile the balances. She did not know the amount of Edward's salary from his various companies, nor have any idea of the income of those companies. Petitioner and Edward filed joint Federal income tax returns for 1972 and 1973. [4] Petitioner was given the returns to sign in blank, and they were thereafter completed by Edward's accountants and filed. She had no knowledge of the contents of the returns and had no discussions with Edward or his accountants about them. Having no knowledge of the scope of Edward's operations or the way the books of his enterprises were kept, she had no basis for believing that there was any understatement of income in her joint returns. In fact, *661 as the parties have stipulated, the unreported income herein derives from receipts of Lubrano Industries, Inc. which were diverted from that company to Edward and which he failed to report in his joint returns. Petitioner's marriage to Edward did not go smoothly. They almost separated at the beginning of their marriage, and although this rift was apparently smoothed over, and they moved to the new Colts Neck house in 1974, petitioner and Edward ceased living together as husband and wife in 1975, and Edward departed the household in late 1976 or early 1977. The occasion for his departure was that Edward was indicted in January 1977, in the Federal District of New Jersey on charges of conspiring to conduct Lubrano Industries, Inc. pursuant to a pattern of racketeering in violation of 18 U.S.C. 1962 *662 (d). Two months later, Edward also had filed against him an information charging him with attempted evasion of his individual income taxes for the year 1973 in violation of section 7201. [5] On July 12, 1977, Edward pleaded guilty to one count of the racketeering indictment, and also pleaded guilty to the income tax evasion charge. He was sentenced to a prison term of three years on each offense, with the sentences to run concurrently, and was fined $5,000. With Edward's incarceration, his economic empire apparently collapsed. The house at Colts Neck was forced into foreclosure to pay Edward's debts, and petitioner received none of the proceeds. [6] What happened to Edward's various companies is not disclosed, but petitioner got nothing from them. In 1979, petitioner initiated proceedings to divorce Edward in the state courts of New Jersey. In the final divorce entered therein in 1981, all petitioner salvaged from the wreck of the marriage was some household furniture and a dry cleaning plant serving three dry cleaning shops in nearby New Jersey communities. *663 These assets were encumbered with debt, including unpaid taxes to the United States and to the State of New Jersey. Petitioner, without prior business experience, had to take these plants and operate them in order to live and pay off the accumulated debts. OPINION Because of stipulations and concessions by the parties, the sole issue presented for our determination is whether petitioner should be relieved from liability for deficiencies of income tax and interest for the years 1972 and 1973, resulting from joint returns which she filed with her then husband, because of the provisions of section 6013(e). [7]
*664 The parties have stipulated that petitioner and Edward filed joint returns for 1972 and 1973; that the omissions from gross income in each year were greater than 25 percent of the amounts shown on said returns; and that the omitted income was attributable to Edward and not to petitioner. The requirements of section 6013(e)(1)(A) are thus satisfied, and we turn our attention to the remaining requirements of section 6013(e), all of which petitioner must meet in order to be relieved of liability. Adams v. Commissioner,60 T.C. 300 (1973). What are involved here are essentially factual and subjective determinations, based upon the evidence presented and the reasonable inferences to be drawn therefrom. Gurr v. Commissioner,T.C. Memo. 1976-338. In the instant case, petitioner's case essentially rises or falls on the credibility of her own testimony. Without accepting everything she said at face value, and noting that there were certain inconsistencies in her testimony, we nevertheless find on balance that petitioner was a credible witness, that her testimony was reasonable and circumstantial, taken as a whole, and that she is entitled to relief. In *665 so finding, we are mindful that section 6013(e), as a remedial statute, is to be liberally construed for the protection of its intended beneficiaries. Allen v. Commissioner,514 F.2d 908, 915 (5th Cir. 1975), reversing on other issues 61 T.C. 125 (1973). Section 6013(e)(1)(B) requires petitioner to establish that in signing joint returns with Edward for 1972 or 1973, "she did not know of, and had no reason to know of, such omission [of income], * * *." The evidence here shows that petitioner, a person of limited education and work experience, got involved in a situation where she was literally "over her head." She was swept off her feet and married Edward after a six-week courtship in the middle of 1972. Edward, who was apparently a fancy dresser, a fast talker and a "high roller," overwhelmed her with his image as a man of large and complicated affairs, allegedly owning 21 companies, operating his own boat (later two boats), having a private pilot's license and waving large wads of bank notes. Apparently mesmerized by this display, petitioner not only married Edward, but docilely turned over to him a joint interest in her home and handed over *666 all the contents of her savings account. She also acquiesced in Edward taking away her car, against the promise of another car, which Edward ultimately gave her. In the meantime, Edward moved into petitioner's house, and, while doling out sums of cash to her every week for the household, continued to retain all the economic strings in his hands.He went forward with the construction of a new home, already begun at Colts Neck, New Jersey, selling petitioner's former home without her knowledge and just informing her that the proceeds had gone towards the building of the new house. Although he put petitioner's name on his personal checking account, and gave petitioner a power of signature on two corporate accounts which he maintained, he apparently kept petitioner well insulated from the intricacies of his various business ventures, telling her essentially nothing about what he was doing (petitioner candidly testified that she probably would not have understood him if he had told her). So far as the use of these checking accounts was concerned, the evidence shows that petitioner only drew checks four times (apparently at Edward's instruction). Three of those checks were to pay for *667 a new boat which Edward was buying in his own name, and the fourth check was in partial payment for the new car which Edward had promised petitioner as a wedding gift. So far as deposits to these banking accounts were concerned, there were 19 instances in each year when checks were deposited to Edward's personal account from business customers of Edward's various enterprises, and purporting to bear the endorsement of petitioner. [8]
Even accepting, arguendo, that all the endorsements on these checks may in fact have been petitioner's, and accepting that these checks undoubtedly represented business gross income of one or more of Edward's enterprises, it does not result that petitioner knew or had any reason to know that such checks represented gross income which had not been properly recorded on the corporate books and were not reflected either in the corporate tax returns or in the joint returns of petitioner and Edward. Petitioner stipulated, and we have found, that she signed the joint tax returns for 1972 and 1973. However, *668 the record does not show that she had any reason to suppose that the returns as filed were inaccurate. Absent other facts indicating guilty knowledge, we are not prepared to find that the mere act of depositing checks to a checking account constitutes notice that such checks are not going to be properly reflected in a tax return. It is apparent to us that petitioner simply did as she was told, and deposited checks to the checking account upon Edward's instructions, paying no attention to the source of the checks. We are satisfied that petitioner had no actual knowledge of the omissions from the joint returns, and, given her lack of knowledge of Edward's affairs, we do not think she was properly chargable with such knowledge. Cf. G&G Records v. Commissioner,T.C. Memo. 1983-343. We accordingly hold that petitioner has satisfied the requirements of section 6013(e)(1)(B). Cf. Sanders v. United States,509 F.2d 162 (5th Cir. 1975); Gurr v. Commissioner,supra.
Turning finally to the requirements of section 6013 (e)(1)(c), and bearing in mind the pertinent provisions of respondent's regulations, [9] we think we have a situation *669 in this case where, considering the totality of the facts and circumstances, it would be inequitable to hold petitioner liable for Edward's tax derelictions. We do not think petitioner benefitted significantly from her marriage to Edward or from the unreported income involved herein, over and beyond normal marital support, cf. Mysse v. Commissioner,57 T.C. 680 (1972); Miriani v. Commissioner,T.C. Memo. 1976-122, and, indeed, it appears that petitioner may have been the net loser from the whole relationship. At the time of her marriage, Edward persuaded her to hand over all her savings and to title her house in their joint names. Edward thereafter sold the house without petitioner's knowledge, and she never knew what happened to the proceeds, except that he told her that they had gone towards the building of their new home at Colts Neck. Although they lived in that new house for a couple of years after its completion, it had to be sold to pay Edward's debts at the time he went to prison, and petitioner realized nothing from it. Her "gift" of a new car from Edward, purportedly as a wedding gift, was offset at least in part by Edward taking petitioner's *670 own car and giving it to one of his daughters by a prior marriage. When Edward's empire finally collapsed and petitioner subsequently divorced him after he was sent to prison, all that she was awarded in the divorce proceedings was some household furniture and three dry cleaning shops which were encumbered with debt, including liabilities for back taxes to both Federal and state governments, and which she had to manage as best she knew how in order to survive. Cf. Allen v. Commissioner,supra;Feingold v. Commissioner,T.C. Memo. 1980-163. *671 In sum, we think petitioner here was more sinned against than sinning, and that, given all the facts and circumstances of this case, it would be inequitable to hold her liable for tax deficiencies which concededly arose solely from Edward's separate activities. Cf. Dakil v. United States,496 F.2d 431 (10th Cir. 1974); Gurr v. Commissioner,supra. We hold that petitioner herein has satisfied the requirements of section 6013(e)(1)(c), and accordingly, Decision will be entered for petitioner.
Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Rules of Practice and Procedure of the Tax Court, except as otherwise noted.↩
2. It is not clear in this record whether all these names represented actual separate corporations or business entities, or were simply names used by Edward for his convenience; nor is the relationship of these various organizations to each other explained, except that it appears clear that Edward was in control of all of them. It has been stipulated that Edward was the sole shareholder of Lubrano Industries, Inc.↩
3. At trial, petitioner identified her endorsement signature on certain of these checks, but challenged the validity of what purported to be her endorsement on certain other checks.↩
4. At trial, petitioner questioned the validity of her purported signature on the 1972 return. However, the question is moot; even if the signature was not hers, petitioner has ratified the return as a joint return, having stipulated that she and Edward filed joint returns for both years. Cf. Estate of Campbell v. Commissioner,56 T.C. 1↩ (1971).
5. The Internal Revenue Service also recommended initially that petitioner be prosecuted, but this was apparently dropped.↩
6. Petitioner's former residence at Hillwood Road, East Brunswick, New Jersey, which Edward had caused petitioner to put in their joint names, was apparently sold, without petitioner's knowledge or participation. All Edward told petitioner was that the proceeds had gone into the building of the house at Colts Neck.↩
7. Section 6013(e) reads as follows, in relevant part: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General. Under regulations prescribed by the Secretary or his delegate, if -- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
8. Petitioner identified her endorsement on certain of these deposited checks, but questioned the authenticity of her purported endorsement on others.↩
9. Section 1.6013-5(b), Income Tax Regs., provides: (b) Inequitable defined.↩ Whether it is inequitable to hold a person liable for the deficiency in tax, within the meaning of paragraph (a)(4) of this section, is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefitted from those items. Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse.