**In re Joyce B. BARRY a/k/a Joyce B. Hunt, Debtor.**

**In re Richard E. HUNT, Debtor.**

**Bankruptcy Nos. 381–01490, 382–02267.**

United States Bankruptcy Court, M.D. Tennessee.

April 23, 1985.

Mark Westlake, Douglas A. Brace, David B. Herbert, Nashville, Tenn., for Joyce Barry.

William H. Lassister, Jr., Nashville, Tenn., for Richard Hunt.

Robert Welch, Tax Div., Dept. of Justice, Washington, D.C., E. Franklin Childress, Jr., Asst. U.S. Atty., Nashville, Tenn., for I.R.S.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The debtors, Joyce B. Barry and Richard E. Hunt, filed Chapter 11 petitions on May 5, 1981, and July 15, 1982, respectively. The United States of America, through the Internal Revenue Service ("IRS"), filed Proofs of Claim for income taxes, penalties, and interest for the years 1972, 1974, 1975, and 1976. This court has jurisdiction to determine the debtors' various objections to the tax claims. *See* 11 U.S.C. § 505(a)(1).

The following constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B).

For all years in question, both debtors signed joint federal income tax returns. Their revenues and expenses were mostly derived from the construction and operation of motel properties in Tennessee and Florida. The debtors were divorced in 1977. Additional facts will be set out as they pertain to specific issues below.

### I.

### INTEREST ON HOLLYWOOD FEDERAL NOTE FOR YEARS 1974 AND 1975

■ The debtors have objected to the reduced amount of deductible interest allowed by the IRS on a loan incurred at Hollywood Federal Savings and Loan ("Hollywood") in connection with the construction and operation of a Ramada Inn at the Fort Lauderdale, Florida airport. The IRS allowed an I.R.C. § 163 deduction of $88,386.87 for 1974 and $79,993.61 for 1975. The debtors claim $138,246.09 for 1974 and $142,263.58 for 1975. The IRS based its allowance on statements received from Hollywood. [Exhs. 3 and 4]. However, these statements concern a loan # 28040 in the name of M.J.B. Prime, Inc. or Morris Clendenin. The IRS failed to explain how these entities are connected with the debtors' affairs. The debtors offered Hollywood's ledgers of the account history of a loan # 28660 and copies of their checks paid to Hollywood during the appropriate time. [Exhs. 1 and 2]. After considering the ledgers, cancelled checks, and the trial testimony, this court sustains the debtors' objection on this issue and finds that the debtors are entitled to their claimed interest deductions.

### II.

### FORM 4549 WAIVER FOR 1972 TAX YEAR

■ Debtor Joyce Barry argues that the IRS's claim for 1972 should be barred

against her because the assessment was made without the issuance of a "Notice of Deficiency." I.R.C. § 6501(a) states that no tax may be collected without assessment made within three years of the filing of the tax return or the due date for the tax return, whichever is later. I.R.C. § 6213(a) prohibits assessment until a Notice of Deficiency has been mailed to the taxpayer. It is undisputed that no such document was mailed for 1972. However, the IRS states that a proper waiver of notice as provided in I.R.C. § 6213(d) [1] was executed.

On February 17, 1975, both debtors signed a consent to the immediate assessment and collection of taxes on IRS Form 4549 for the year 1972. This assessment showed tax owing by the debtors of $152,-434.12. (Exh. 15). There seems to be no dispute that this consent to assessment would have been valid had the matter ended there. However, the tax due was later reduced to $150,005.21 [2] and a new Form 4549 was signed by Richard E. Hunt on March 25, 1975. (Exh. 16). Joyce Barry never signed a new waiver form for the amended assessment and thus contends that she never made a valid waiver. We find her argument to be without merit.

The policy of the IRS is set out in its Internal Revenue Manual at § 424(12).2(2) (Exh. I): "If an error was made in computing the deficiency, overassessment, or penalty shown on a waiver previously obtained, it will not be necessary to obtain a new waiver if correction of the error is in favor of the taxpayer (less tax due or higher refund due)."

The purpose of the Internal Revenue Manual is simply to aid the internal administration of the IRS and its provisions are not binding on taxpayers. *See U.S. v. Mapp*, 561 F.2d 685 (7th Cir.1973). However, this policy is not inconsistent with any statute or regulation and we believe its application to these facts does not violate the debtor's substantive statutory rights. It is difficult to sympathize with the taxpayer on this issue. She signed forms consenting to an assessment of $152,434, but now wishes to argue that she never agreed to a corrected assessment of $150,005. While we would not say that a new assessment for lower taxes never needs a new waiver, we find that the first waiver was effective and Joyce Barry was not prejudiced by the failure to get her signature on the second assessment notice.

■ The debtors also assert that the waiver was never "accepted" by a properly authorized delegate of the Secretary of Treasury. They rely on *Steiner v. Nelson*, 259 F.2d 853 (7th Cir.1958) where the court ruled that the Commissioner did not "accept" a waiver and, therefore, the taxing authorities were not relieved of their statutory obligation to give notice before assessment and collection. However, the waiver in *Steiner* contained a provision stating that "this waiver of restrictions is subject to acceptance by the Commissioner on the basis of the settlement hereinbefore proposed and if not accepted, it will be of no force or effect." *Steiner* at 856. The waivers here stated "it is understood that this report is subject to acceptance by the district director." Both waivers were signed by a revenue agent. A revenue agent is a delegate of the district director authorized to accept waivers. His signature is sufficient "acceptance" of this waiver. *Moore v. Cleveland Railway Co.*, 108 F.2d 656, 661 (6th Cir.1941); Treas. Reg.

---

**1.** I.R.C. § 6213(d) provides as follows:

Waiver of Restrictions: The taxpayer shall at any time (whether or not a notice of deficiency has been issued) have the right by a signed notice in writing filed with the Secretary, to waive the restrictions provided in subsection (a) on the assessment and collection of the whole or any part of the deficiency.

**2.** IRS officer Phillips testified that the change resulted from a "difference in a computation as to the capital gains and ordinary income with reference to the sale of the Holiday Inn and an investment credit adjustment." (Tr. at 174). The debtors argue that the changes are substantive and not computational. It appears to this court that the changes were computational. Whatever label is attached to the changes, it is clear that they were minor changes which had the effect of benefiting the taxpayer.

§ 1.6213; Testimony of Mr. Phillips at 181–182. *Cf. Holbrook v. United States,* 284 F.2d 747 (9th Cir.1960) (no written consent to waiver by Commissioner is necessary).

### III.

### INTEREST PAYMENTS TO INVESTOR'S REALTY TRUST

■ The debtors assert they may deduct interest payments made to Investor's Realty Trust ("IRT") of $191,704.57 and $65,238.90 for 1974 and 1975 respectively. The payments to IRT, made from the debtors' personal funds,[3] were the direct obligations of Hunt-Florida Enterprises, Inc., a corporation formed by the debtors to develop and operate motels in Florida. The debtors testified that Hunt-Florida Enterprises was formed solely to avoid Florida usury restrictions on personal loans. (Tr. at 135). Richard Hunt claims that these interest payments were made pursuant to his personal guaranty and were in the course of his business of developing and operating motels and, therefore, the payments should be deductible on his personal return.

In a case involving very similar facts, the United States Court of Appeals for the Tenth Circuit has ruled that a taxpayer is not entitled to interest expense deductions for amounts personally paid on a loan made to the taxpayer's wholly owned corporation. *Crouch v. United States,* 692 F.2d 97 (10th Cir.1982). In *Crouch,* the taxpayer built a luxury apartment complex in Florida. A corporation was formed to avoid interest limitations on loans to individuals. The taxpayer executed a personal guaranty of payment on the corporate note and then made payments on the indebtedness. The holding of the *Crouch* court is directly on point:

> Interest payments are deductible only if made with respect to debts of the taxpayer. Here the named borrower under the contract, mortgage, and mortgage note was Seventeen Ventures, Inc.

Crouch's argument that the debt was personal to him is based upon the unconditional loan guaranty and the circumstances surrounding the loan transaction. He contends that the lender knew the corporation could not make the payments and intended that Crouch make those payments personally during 1970. In essence, Crouch is urging the court to disregard both the corporate entity and the form in which the transaction was cast. This the trial court refused to do, and we agree with its conclusion.

Under the Internal Revenue Code, brightline choices are available to taxpayers with regard to the form in which to operate businesses ... Courts have consistently interpreted *Moline Properties* [319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) ] to preclude ignoring the corporate form when adoption of that form has served a business purpose. *See, e.g., Lane v. United States,* 535 F.Supp. 397 (S.D.Miss.1981); *George Sarkisian,* 43 T.C.M. (CCH) 1074 (1982); *Robert M. Modeer,* 43 T.C.M. (CCH) 782 (1982). *Incorporation for the sole purpose of avoiding state usury laws has been held to be a business purpose. William B. Strong,* 66 T.C. 12 (1976); *aff'd mem.,* 553 F.2d 94 (2d Cir.1977); *accord Collins v. United States,* 386 F.Supp. 17, 21 (S.D. Ga.1974), *aff'd per curiam,* 514 F.2d 1282 (5th Cir.1975); *David F. Bolger,* 59 T.C. 760, 766 (1973). Crouch urges that we disregard the form in which the loan transaction was cast to permit him to receive the tax benefit of interest paid. We may not do so ... Crouch has received benefits associated with incorporation; he cannot now disown the burdens associated therewith.

*Crouch* at 99–100 (emphasis added). *See also Lane v. United States,* 535 F.Supp. 397 (S.D.Miss.1981).

The debtor cites cases such as *Parker v. Commissioner,* 33 T.C.M. 289 (1974) and

---

**3.** The amounts claimed are per a statement from IRT (Exh. 5). The debtor could only show cancelled checks payable to IRT from personal funds of $115,928.48 in 1974 and $5,291.67 in

1975 (Exh. 6). However, Mr. Hunt testified that all payments came from his personal funds. (Tr. at 132–135).

*Gamble v. Commissioner,* 19 T.C.M. 1343 (1960) for the proposition that "if the taxpayer's guarantee of a corporation's debt is related to the taxpayer's trade or business, payments pursuant to that guarantee are properly deductible." (Debtors' brief at 3). These cases do not involve ordinary interest deductions as are here claimed, but rather are concerned with whether a guarantor may deduct loan payments as business bad debts. Although the debtors have not pleaded or briefed the "bad debt" argument, we interpret the citations to *Parker* and *Gamble* as an assertion of this theory.

■ A bad debt deduction may be taken when the guarantor is unable to recover his payments from the principal debtor. *See Putnam v. United States,* 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956); *In re Vaughan,* 719 F.2d 196 (6th Cir.1983). The deduction may be either a business or nonbusiness deduction depending on whether the guarantee was made to advance or preserve profit-making activity of the taxpayer's trade or business. *See Harsha v. United States,* 590 F.2d 884 (10th Cir.1979); *Estate of Mann,* 731 F.2d 267 (5th Cir. 1984).

■ The bad debt deduction suggested by the debtors fails because of the rule that "the guarantor cannot take a business or loss deduction until the taxable year in which it can show that there is no recourse against the principal obligor." *National Can Corp. v. United States,* 520 F.Supp. 567, 580 (N.D.Ill.1981) *aff'd,* 687 F.2d 1107 (7th Cir.1982). The debtors have offered no proof showing that their interest payments resulted in bad debts recognizable in 1974 or 1975. In order to qualify for the bad debt deduction for these years, the debtors must show that the underlying obligations of Hunt-Florida Enterprises were worthless *at the time the payments were made. Estate of Mann,* 731 F.2d 267 (5th Cir.1984); *Horne v. Commissioner,*

523 F.2d 1363 (9th Cir.1975). In *Holland v. Commissioner,* 728 F.2d 360 (6th Cir.1984) the Sixth Circuit noted that a taxpayer must explain why the corporation would be unable to pay back the debt, usually by pointing to a particular fact or circumstance which shows the worthlessness of the debt. "Generally this burden is met by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value ... the unsupported opinion of the taxpayer alone that the debt is worthless will not usually be accepted as proof of worthlessness." *Holland* at 362, *quoting Dustin v. Commissioner,* 53 T.C. 491, 501–502 (1969) *aff'd,* 467 F.2d 47 (9th Cir.1972). The debtors have not proven the worthlessness of the debt and the deduction is accordingly not available.[4]

■ The debtors alternatively claim that after execution of a "Mortgage Modification Agreement" on September 30, 1975, they became jointly obligated with Hunt-Florida Enterprises and accordingly may deduct interest payments pursuant to that obligation. The IRS concedes that the taxpayers would be entitled to interest deductions after that time "if they could show that they were personally liable for the debt." (IRS brief at 16). From examination of the new note and agreement (Exh. 8), we find that the debtors did become personally liable on the note and may accordingly deduct interest payments made after September 30, 1975 pursuant to the modification agreement. *See Williams v. Commissioner,* 3 T.C. 200 (1944). Exhibit 6 indicates one payment of $2,500 which becomes deductible as interest.

## IV.

### INNOCENT SPOUSE—JOYCE BARRY ONLY

Debtor Joyce Barry argues that she is not liable for tax on the gain from the sale

---

**4.** Hunt-Florida Enterprises held title to certain properties in Florida used as collateral for the loan. Although the debtors claim the properties may have lost some value, they did not show that these properties were so worthless in 1974 or 1975 that they should not be considered in Hunt-Florida Enterprises' ability to repay Mr.

Hunt. *See Estate of Mann,* 731 F.2d 267 (5th Cir.1984) (value of collateral is a factor in consideration of worthlessness of debt). Further, debtor's post-trial brief (p. 4) asserts that Hunt-Florida Enterprises, Inc. did not become insolvent until September of 1977.

of the Ft. Lauderdale Ramada Inn or for taxes resulting from the overstatement of deductions relating to the Inn because she was an "innocent spouse" as defined in I.R.C. § 6013(e) with respect to these items. This Code section provides:

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) In General.—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, or had no reason to know, that there was such substantial understatement, and

(D) taking into account all of the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

At the time of trial innocent spouse status was only claimed for the gain on the motel sale since the Code provisions then in effect gave relief only for omissions from gross income. The Tax Reform Act of 1984, Pub.L. 98–369, amended I.R.C. § 6013 to provide relief for any "grossly erroneous" items of one spouse which cause an understatement of tax. A grossly erroneous item includes "any claim of a deduction ... by such spouse in an amount for which there is no basis in fact or law." I.R.C. § 6013(e)(2)(B). Joyce Barry now claims that the 1984 amendment applies

and entitles her to innocent spouse status with regard to approximately $200,000 of expense deductions claimed in 1974 which were disallowed by the IRS.

■ We agree with the debtor's contention that the 1984 amendments apply to this controversy. However, the amendments provide that relief is only available when the understatement of income, unless attributable to the omission of items, exceeds specified percentages[5] of the spouse's income in the "pre-adjustment year." I.R.C. § 6013(e)(4). The "pre-adjustment year" is the last taxable year that ended prior to the date the deficiency notice was mailed. In this instance, no deficiency notice was mailed (see Issue II). The debtors have not argued or proven what year is the pre-adjustment year in this proceeding nor have they demonstrated that they fall within the required percentages for application of the 1984 Amendments. If we assume that the waiver made in 1975 operates as a deficiency notice replacement for purposes of this section then 1974 is denoted as the pre-adjustment year. The tax liability attributable to the disallowed deductions must then be compared with Joyce Barry's Adjusted Gross Income ("AGI") for that year. See AM. JUR.2d *A Complete Analysis of the 1984 Tax Reform Act,* ¶ 742, p. 231 (1984). Ms. Barry has offered no evidence as to either the amount of tax liability attributable to the disallowed deduction or the amount of her AGI for 1974. Without such proof, innocent spouse status must be denied with respect to the excess deductions.

The "percentage of AGI" test does not apply to omitted items so we must further analyze the innocent spouse claim with respect to the sale of the Inn. The amendments do not disturb the basic requirement for relief that the spouse be found "innocent" as defined in § 6013(e)(1)(C).

■ The party claiming relief must satisfy all elements of the statute. We

---

**5.** If Adjusted Gross Income for the pre-adjustment year is $20,000 or less innocent spouse relief from liability will apply only if the tax liability caused by the understatement exceeds

10% of AGI. I.R.C. § 6013(e)(4)(A). If AGI for the pre-adjustment year is over $20,000, the liability caused by the understatement must exceed 25% of AGI. I.R.C. § 6013(e)(4)(B).

hold that debtor Joyce Barry failed to satisfy the requirements of subsection (C). The burden of proof is on the debtor to show that she neither knew of nor had reason to know of the omission and that she did not benefit from it. S.Rep.P.L. 91–679, p. 3; *Jackson v. Commissioner,* 72 T.C. 356, 360 (1979). The resolution of this issue depends on "essentially factual and subjective determinations, based upon the evidence presented and the reasonable inferences to be drawn therefrom." *Lubrano v. Commissioner,* 47 T.C.M. 855 (1984). In *Shea v. Commissioner,* 48 T.C.M. 304, 308 (1984), the Tax Court stated that "the standard to be applied in determining whether a taxpayer had reason to know of omissions is whether a reasonable person under the circumstances of the taxpayer at the time of signing the return could be expected to know of the omissions." "Knowledge" as contemplated by the statute means knowledge of the transactions underlying the understatement but not necessarily knowledge of the details and tax consequences of the transactions. *See Quinn v. Commissioner,* 524 F.2d 617 (7th Cir.1975); *McCoy v. Commissioner,* 57 T.C. 732 (1972). Significant participation in business affairs or bookkeeping is a factor to consider. *See Sanders v. United States,* 509 F.2d 162 (5th Cir.1975). *Barnhill v. Commissioner,* 46 T.C.M. 577 (1983).

■ The evidence in this proceeding shows that Joyce Barry was involved enough in her husband's construction/development business to overcome her innocent spouse claim. During the course of their marriage, she handled some bookkeeping, paid bills, was responsible for some property management and was jointly liable on many of the obligations incurred in financing the various ventures. Although she was not involved with the day-to-day operation of the Ft. Lauderdale Ramada Inn, she did sign the note on the debt financing the hotel (Tr. at 29) and had some correspondence with the owners of the hotel's ground lease (Tr. at 25, 27). It certainly cannot be doubted that she knew of her husband's interest in the property. Ms. Barry knew that the property had been disposed of though she claimed some confusion about the circumstances:

Q. What do you know about the disposition of that property?

A. I thought that the books or whoever just took it back for the loan.

Tr. at 23.

This proffered ignorance of the details of the hotel sale does not enable Joyce Barry to claim innocent spouse status. We are convinced that she is an intelligent woman who at the very least had reason to inquire about the disposition of the property where she was a co-signor on the underlying note. She cannot close her eyes and feign ignorance of this transaction. *Terzian v. Commissioner,* 72 T.C. 1164, 1170 (1979). "Where the facts of a transaction are in the possession of the spouse seeking relief, or reasonably within her reach, her lack of knowledge of the legal tax consequences of such transactions is insufficient to base a claim for relief under section 6013." *Lynch v. Commissioner,* 45 T.C.M. 1125, 1143 (1983). In light of our holding on the knowledge issue, we need not decide whether Joyce Barry received "significant benefit" from the omitted items. *See* Treas.Reg. § 1.6013–5(b).

## V.

### RODEWAY INN LOSS IN 1976—CORPORATE OR PERSONAL?

■ In 1976 the debtor, Richard E. Hunt, sustained a loss of $39,748.19 in connection with the operation of the Nashville Rodeway Inn. Although the IRS had allowed similar losses in 1974 and 1975, it denied the 1976 loss on the ground that the business was transferred to a corporation during that year. The general rule relied on by the IRS is that after property or contracts are transferred to a corporation which proceeds to conduct business, the corporation must be recognized for tax purposes. *See Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1942).

The IRS cannot avail itself of this general rule because the facts here show that the corporation, Road Ventures Inn, Inc. had nothing to do with the operation of the Rodeway Inn in 1976. The debtors assert (and the IRS did not rebut) that: (1) the Inn, its assets, and the underlying property were not transferred to the corporation; (2) no leases or other contracts regarding the Inn were granted to or by the corporation; (3) the corporation had no stock, officers or directors; (4) although a corporate checking account may have temporarily existed (*see* Tr. at 161), its activity was minor; and, (5) Mr. Hunt held legal title to the property.

The uncontroverted testimony of Mr. Hunt shows the extent of the corporation's activity:

Q. Now, the Internal Revenue Service has testified that they disallowed a deduction for you in 1976 because of the fact that beginning in 1976 or late 1975 you operated this motel as a corporation. Is that correct?

A. Yes.

Q. It's correct that they disallowed it for that reason?

A. Yes.

Q. And they rely on a charter which they said you obtained on December 18, 1975. Would you tell the Court under what circumstances you acquired a corporate charter on December 18, 1975?

A. I was trying to find a name, a trade name, whatever, for the motel. And I applied for a charter to protect the name.

Q. Did you do anything else in 1975 or 1976 in regard to that charter by in any way activating that business as a corporation?

A. I did not activate the corporation.

Q. Now, prior to the time that the charter was obtained, did you use any kind of an E.I. or an identification number?

A. Yes. I used the same number I had been using for years in my Lebanon businesses.

Q. Did you have a payroll account during that period of time?

A. Yes.

Q. What name did you carry the payroll account in prior to January 1, 1976?

A. Richard E. Hunt.

Q. And tell me when was the first time you opened up a corporate account.

A. I officially asked for a federal I.D. number and a state I.D. number, franchise-excise number, sometime in '80.

Q. Sometime in 1980?

A. Yes. And so changed the numbers, both numbers.

Q. But as far as any corporate bank account, did you have any corporate bank account prior to 1980?

A. I may have had the name inprinted on an account, but I never ran a corporation as such.

Q. You never ran any checks through that corporation?

A. Not to my knowledge.

Q. You said the property was owned by you individually. I'm talking about the land that was deeded to you individually. Did you ever deed the land to a corporation?

A. We originally in one of the charters may have discussed an agreement whereby a corporation would run the motel and leased it from me individually. But that was never activated.

Tr. at 124–126.

Although the general rule is that the corporate entity should not be ignored, this rule does not apply where the corporation has been wholly inactive with regard to the transactions sought to be taxed. *See Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Bystry v. United States*, 596 F.Supp. 574, 578 (W.D.Wis.1984) ("merely filing articles of incorporation with a vague intention of operating business activities through the corporation does not suffice to

make income from the business attributable to the corporation"). The testimony of the IRS agent who disallowed the deduction reveals that she did ascertain the existence of a corporation, but found no other evidence indicating that the corporation acted in any way to operate the motel. Tr. at 58–59. Though the IRS has a low burden of proof in showing that the corporation met the *Moline Properties* standard of "carrying on of business," they offered no evidence by which we may find that the corporation should be the responsible taxpayer for the operations of the Nashville Rodeway Inn in 1976.

## VI.

## WHEN TO RECOGNIZE CLEARVIEW SHOPPING CENTER LOSS

In 1974, the debtors acquired land in Mt. Juliet, Tennessee to construct a shopping center known as the Clearview Plaza. The debtors mortgaged the property in consideration of a construction loan of approximately $1.4 million dollars from First and Mid-South Mortgage Corporation ("Mid-South"). On September 9, 1976 the mortgage was foreclosed and the property was deeded by trustee's deed to Mid-South. (*See* Exh. 23). However, the debtors objected to the value assigned to the property and the resulting litigation was not settled until March 8, 1978 when the debtors executed a note to Mid-South for $288,750. In May of 1978, the property was finally resold by Mid-South. The debtors argue that the loss should be recognized in 1976, the year of foreclosure. The IRS claims that the loss should not be recognized until 1978 when the litigation ended.

In *Helvering v. Hammel*, 311 U.S. 504, 61 S.Ct. 368, 85 L.Ed. 303 (1941) the Supreme Court announced the rule that the

event of foreclosure is a "sale" for purposes of gain or loss recognition: "[S]ince the foreclosure contemplated by the decree was foreclosure by sale and the foreclosed property had value which was conclusively established by the sale for the purposes of the foreclosure proceeding, the sale was the definitive event establishing the loss within the meaning and for the purpose of the revenue laws." 311 U.S. 512, 61 S.Ct. 372.

■■ Gain or loss is determined by comparing the amount realized at the foreclosure sale with the property's adjusted basis. *Harris v. Commissioner*, 34 T.C.M. 597 (1975). Though the amount realized was disputed by the debtors, both the amount realized and the property's basis were ascertainable on the day of the foreclosure sale.

■■ The foreclosure sale date will normally be the time for determining the relevant figures and subsequent litigation should not change that result. If a subsequent appeal or other litigation changes the tax effects or amounts determinated at the time of foreclosure then this may be reflected in amended or subsequent returns. *See* Treas.Reg. § 1.165–1(d). We believe that the tax consequences of this transaction were sufficiently final in 1976 for loss recognition purposes.[6]

## VII.

## INVESTMENT TAX CREDIT

The debtors contend that they are entitled to an investment tax credit for furnishings and equipment purchased for the Nashville Rodeway Inn and allegedly placed into service in 1974. The following items are listed by the debtors as qualifying for the investment tax credit:

---

**6.** There is authority that no deduction is allowable for that part of a loss for which the taxpayer has a reasonable claim for reimbursement. *See Parmelee Transportation Co. v. United States*, 351 F.2d 619 (Ct.Cl.1965); *Scofield's Estate v. Commissioner*, 266 F.2d 154 (6th Cir. 1959). The IRS has not argued that the debtors' litigation with the mortgage company regarding the amount realized at the foreclosure sale constituted "reasonable basis of recovery." *See Duke v. Daniels*, 660 S.W.2d 793 (Tenn.1983) (absent fraud, inadequate price at a foreclosure sale is not alone grounds to set aside the sale). Nor have they argued that the possible existence of a state law redemption period may delay the time for recognition of the loss. *See R. O'Dell & Sons Co., Inc. v. Commissioner*, 169 F.2d 247 (3d Cir.1948).

| | |
|---|---|
| Elevators | $ 42,514.20 |
| Window Air Conditioners | 54,877.80 |
| Hotel Furnishings & Carpeting | 232,624.03 |
| Kitchen Equipment | 15,951.53 |
| Fixtures | 1,250.00 |
| Other Carpeting | 1,112.72 |
| Cabinets | 11,250.00 |
| Phone Equipment | 59,370.15 |
| TOTAL | $419,450.43 |

(Exh. 26).

■ The burden of proving entitlement to the credit is on the taxpayer. *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed.2d 212 (1933); *Ruplinger v. Commissioner*, 47 T.C.M. 1430 (1984). The debtors' proof consists of cancelled checks, records from some suppliers, and Mr. Hunt's testimony. The debtors offered no records of the retirement or disposition of any item listed above.

The Treasury Regulations require taxpayers claiming an investment credit to meet certain recordkeeping requirements.[7] Treas.Reg. § 1.47–(e)(1)(i) states:

Record requirements. In general, the taxpayer must maintain records from which he can establish, with respect to each item of section 38 property, the following facts:

(a) The date the property is disposed of or otherwise ceases to be section 38 property;

(b) The estimated useful life[8] which was assigned to the property under paragraph (e) of § 1.46–3;

(c) The month and the taxable year in which the property was placed in service[9], and;

(d) The basis (or cost) actually or reasonably determined of the property.

The regulations raise presumptions that the facts are adverse to a taxpayer who fails to maintain the required records. Treas.Reg. § 1.47.–(e)(1)(iii) example 1, 2, and 3.

■ The regulations require that a taxpayer be treated as having disposed of, in the taxable year, any investment credit property which the taxpayer cannot establish was still on hand at the end of that year.[10] This causes the recapture of credits taken in previous years. I.R.C. § 47. Here, the debtors have not maintained records by which we can determine which of the assets were still on hand after one year, two years, three years, etc. It simply is not enough for a taxpayer to show that some assets were purchased and placed into service. Here the debtors are claiming the Investment Tax Credit many years after the fact. Under these conditions, they

---

7. These regulations are a part of the regulations dealing with determining the recapture of investment tax credit when investment credit property is prematurely disposed. However, the rules and examples of the regulation are applicable to all taxpayers who take the credit and are pertinent in the present situation. *See* R.I.A. Tax Coordinator ¶ L–12040–42.

8. In 1974, the credit was 7% of the "qualified investment in § 38 property." However, the basis or cost of the qualifying property is reduced when its useful life is less than seven years. The applicable percentages of the investment qualifying for the ITC are as follows:

| Useful Life | % of Basis Qualifying for Credit |
|---|---|
| 3 years or more but less than 5 years | 33⅓ |
| 5 years or more but less than 7 years | 66⅔ |
| 7 years or more | 100 |

9. Mr. Hunt testified that the property described in Exhibit 26 was placed into service in 1974. He stated that the hotel was opened in August of that year and that "I could not open the business without these items." Tr. at 167.

10. Treas.Reg. § 1.47–1(e)(1)(iii) example 1:

Corporation X, organized on January 1, 1964, files its income tax return on the basis of a calendar year. During the years 1964 and 1965, X places in service several items of machinery to which it assigns estimated use-

ful lives of 8 years. X places the items of machinery in a composite account for purposes of computing depreciation. When X's 1966 return is being audited, X is unable to establish whether the items placed in service in 1964 and 1965 were still on hand at the end of 1966. Therefore, for purposes of paragraph (a) of this section, X is treated as having disposed of, in 1966, all of the items of machinery placed in service in 1964 and 1965.

must submit evidence by which we can find that the items in question were in service for the required time periods. *See Lysek v. Commissioner,* 34 T.C.M. 1267, 1281 (1975) *aff'd,* 583 F.2d 1088 (9th Cir.1976).

Even if the recapture regulations cited above do not compel a disallowance of the credit there are other reasons why the credit should be disallowed. The debtors must show credible evidence by which a decision can be made as to useful lives. *Easter v. Commissioner,* 338 F.2d 968 (4th Cir.1964); *Hawkins v. Commissioner,* 713 F.2d 347 (8th Cir.1983). The debtors have not assigned or proven useful lives for the items claimed. The only evidence in the record concerning useful lives is the testimony of Mr. Hunt on cross-examination by the IRS. He testified that elevators would last "five, ten years with repairs," air conditioners "hopefully five years," cocktail lounge equipment "less than five years," and that "less than five percent" of the carpet lasted five years while "some amount" of carpeting lasted less than three years. No testimony was given concerning any of the other items listed. No evidence was offered as to the actual lives of these assets even though Mr. Hunt testified some ten years after these assets were purchased. We find that the debtors have not carried their burden of proof on this issue.

Also, the evidence offered by the debtors in Exhibit 26 is far from compelling. For example, $232,624.03 claimed as Hotel Furnishings & Carpeting is based on purchases from "International Interiors Inc." Although some of the purchases are itemized, $178,675.32 of the total is lumped together under the heading "Original Contract." We cannot speculate as to what this might include.[11] We conclude that the evidence

offered by the debtors does not provide any reasonable basis for determining the amount of investment qualifying for the credit. *See Factor v. Commissioner,* 281 F.2d 100 (9th Cir.1960) (when the taxpayer fails to maintain proper records, the court may "bear heavily if it chooses upon the taxpayer whose inexactitude is of his own making").

An appropriate order will be entered.

---

11. Because of our holding that the taxpayers have not supplied sufficient evidence by which to make a reasonable estimate of the allowable tax credit, we need not address the IRS's other objections. These arguments include: (1) the window air conditioners do not qualify as § 38 property because they are structural components; (2) some carpeting and cabinents may not qualify because they are structural components; (3) debtors have not shown whether any of the claimed items were expensed on previous returns; (4) without other documentation, it is impossible to determine whether amounts on cancelled checks went for the purchase of qualifying items; (5) some purchases may have been for property used at the Ft. Pierce, Florida Ramada Inn; and (6) the telephone equipment amount resulted from a lease agreement which does not qualify for the credit.